**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KEVIN SCHMIDT, Individually and on Behalf of All Others Similarly Situated,<br><br>  Plaintiff,<br><br>  v.<br><br>GARTNER, INC., EUGENE A. HALL, and CRAIG W. SAFIAN,<br><br>  Defendants. | Case No. 3:26-cv-00394<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>Demand for Jury Trial |

Plaintiff Kevin Schmidt ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Gartner, Inc. ("Gartner" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Gartner's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Gartner common stock between February 4, 2025, and February 2, 2026, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning Gartner's expected contract value ("CV") growth and projected revenue of its segments for the full fiscal year 2025. Defendants' statements included, among other things, confidence in the Company's ability to continue to grow non-federal CV rates, despite macroeconomic impacts and repeated reiterations of Gartner's expectations for the consulting segment of its business.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Gartner's growth rates; notably, that it was not truly equipped to handle ongoing challenges in its industry to either meet consulting revenue targets or to increase or even maintain its CV growth rate; Gartner's repeated claims of being able to achieve 12-16% CV growth rates in a "normal" macroeconomic environment proved to be unrealistic. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Gartner's securities at artificially inflated prices.

4.      Investors began to question the veracity of Defendants' public statements on August 5, 2025, during Gartner's earnings call following a same day press release announcing its second quarter fiscal 2025 earnings. In pertinent part, Defendants announced a surprising decline in their CV growth rate, both when considering contracts with the federal government and when excluding them.  Specifically, Defendant's overall CV growth declined from 7% the previous

quarter to only 5%; mirroring, the ex-federal CV growth declined from 8% the previous quarter to merely 6%.

5. Investors and analysts reacted immediately to Gartner's revelation. The price of Gartner's common stock declined dramatically. From a closing market price of $336.71 per share on August 4, 2025, Gartner's stock price fell to $243.93 per share on August 5, 2025, a decline of about 27.55% in the span of just a single day.

6. Notwithstanding the August 5 disclosures, Gartner and the Individual Defendants continued to mislead investors. Defendants continued to create the false impression that they possessed reliable information pertaining to the Company's projected consulting revenue outlook and anticipated CV growth while minimizing the risk of further, more severe slowdowns as a result of seasonality and/or macroeconomic fluctuations. During the November 4, 2025, earnings call, Defendants claimed the "selling environment" impacted by tariff headwinds had begun to "improve." This seemingly led Defendants to refuse to confirm or even suggest any "bottoming" of its CV growth in the fourth quarter and instead repeat its assertion that CV growth will accelerate into 2026.

7. The full truth finally emerged on February 3, 2026, when Gartner again announced a significant decline in its CV growth rate, which had faltered another 2% both including and excluding federal contracts, and for the first time disclosed a significant shortfall of its Consulting segment's performance against the Company's internal projections.

8. Investors and analysts again reacted promptly to Gartner's revelations. The price of Gartner's common stock declined dramatically. From a closing market price of $202.40 per share on February 2, 2026, Gartner's stock price fell to $160.16 per share on February 3, 2026, a decline of nearly 20.87% in the span of one day.

3

## JURISDICTION AND VENUE

9.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

10.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

12.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Gartner is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

13.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

14.     Plaintiff purchased Gartner common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Gartner is attached hereto.

15.     Gartner, Inc. is a Delaware corporation with its principal executive offices located at 56 Top Gallant Road, Stamford, CT 06902. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "IT."

16.     Defendant Eugene A. Hall ("Hall") was, at all relevant times, the Chief Executive Officer and Chairman of Gartner.

17.     Defendant Craig W. Safian ("Safian") was, at all relevant times, the Executive Vice President and Chief Financial Officer of Gartner.

18.     Defendants Hall and Safian are sometimes referred to herein as the "Individual Defendants." Gartner together with the Individual Defendants are referred to herein as the "Defendants."

19.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Gartner's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

20.     Gartner is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

21.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Gartner under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

22.     Gartner is a global company that provides technology and business insights to its clientele through guidance, tools, conferences, and direct consulting.

23.     The Company operates through three segments: Business and Technology Insights, Conferences, and Consulting.

### *The Defendants Materially Misled Investors Concerning*

### *Gartner's Revenue and Growth Outlook for Fiscal Year 2025*

### <u>*February 4, 2025*</u>

24.     On February 4, 2025, Defendants conducted an earnings call, highlighting results for fiscal year 2024.  Defendant Safian highlighted Gartner's fiscal 2025 expectations as follows:

> ***We are introducing 2025 guidance, which we view as achievable with opportunity for upside***.
>
> . . .
>
> Before providing the 2025 guidance details, I want to discuss our base level assumptions and planning philosophy for 2025. As you know, the U.S. dollar has strengthened significantly. We expect FX will be around a 2 percentage point headwind to revenue and EBITDA growth for the full year. For research, we continue to innovate and provide a very compelling value proposition for clients and prospects.
>
> The outlook for 2025 research revenue growth is a function of 3 primary factors: first, 2024 ending contract value; ***second, the timing and slope of the continued CV acceleration***; and third, the performance of nonsubscription revenue. Starting with research subscription revenue, which was 77% of 2024 consolidated revenue.
>
> ***Our guidance reflects CV continuing to accelerate during 2025.*** First quarter and first half NCVI are important inputs to calendar 2025 revenue growth. We have

6

taken a prudent view of NCVI phasing because Q1 is a seasonally important quarter for renewals.

With the U.S. Federal Government, we ended 2024 with around $270 million of CV, which is 5% of the total. Our contracts are spread widely across agencies and departments. Around 85% of U.S. Federal CV is in GTS. Almost all the U.S. federal contracts are for 1 year with renewal spread across the year.

We offer a very compelling value proposition for our public sector clients. As Gene discussed, we help government function leaders address their mission-critical priorities. Potential government changes may affect our business in the short term. *We will continue to provide great sales, service and research levels to our clients. This will position us to drive strong growth over time*.

. . .

*We have very good visibility into 2025 revenue with the majority of what we've guided already under contract. This is consistent with last year*.

*For Consulting, which was also about 9% of 2024 revenue, we have more visibility into the first half based on the composition of our backlog and pipeline as usual*

. . .

Our guidance for 2025 is as follows: We expect Research revenue of at least $5.365 billion, which is FX-neutral growth of about 6%. The guidance reflects FX-neutral research subscription revenue growth near 8%, consistent with 2024 CV growth.

We expect Conferences revenue of at least $625 million, which is FX-neutral growth of about 10%. *We expect Consulting revenue of at least $565 million, which is FX-neutral growth of about 2%.* The result is an outlook for consolidated revenue of at least $6.555 billion, which is FX-neutral growth of 6%. We expect full year EBITDA of at least $1.51 billion. On a reported basis, we expect an EBITDA margin of at least 23%.

. . .

We performed well in 2024 *despite continuing global macro uncertainty and a dynamic tech vendor market. We finished the year with high single-digit CV growth.* Revenue, EBITDA, EPS and free cash flow performance exceeded our expectations and the guidance we set a year ago.

. . .

7

> ***With 12% to 16% Research CV growth, we will deliver double-digit revenue
> growth. With gross margin expansion, sales costs growing about in line with CV
> growth and G&A leverage, we will expand EBITDA margins modestly over time.***

(Emphasis added).

25.    A question-and-answer segment followed the Defendants' prepared remarks,
during which the Individual Defendants discussed the impact Gartner's contract value ("CV")
growth rate has on the Company's revenue and their expectations for accelerated growth, in
pertinent part, in the following exchanges:

> <Q: Jeffrey P. Meuler – Robert W. Baird & Co., Inc. – Senior Research Analyst>
> You gave us a lot of perspective, but I'm still trying to tie some of the things you
> gave us together. A 7.8% Q4 CV exit rate with Research subscription constant
> currency growth only landing near 8%, especially when you have an easier comp
> to begin the year and that flows through while the revenue of CV does well then.
>
> Just are you seeing anything from the renewal risk heat map perspective? Or are
> you hearing things from the U.S. Federal Government salespeople or seeing
> something in those renewal trends on the ground yet? Or just anything you're trying
> to signal beyond the prudence in the guidance assumptions to tie those figures
> together?
>
> <A: Eugene A. Hall> ***So the biggest driver of forward year subscription revenue
> growth is going to be the end of year prior year CV growth. And that sort of
> determines, call it, 80% to 85% of how much revenue actually flows through into
> the following year****. The other important part, which we talked about a little bit
> during the prepared remarks, is the phasing of our NCVI quarter-to-quarter-to-
> quarter.
>
> And as we mentioned, we -- ***Q1 is a heavy renewal quarter or a little bit heavier
> than average, and it is our lowest new business quarter. And so we generally take
> a pretty prudent approach*** to how we plan for Q1 and Q2 in CVI. And those -- Q1
> and Q2 are the quarters that can materially move the revenue up or down depending
> on the performance. And so what you're looking at is sort of I would characterize
> as sort of a normal flow of ending contract value growth flowing into 2025 and then
> our "normal" expectations for first half NCVI rolling into that around 8% constant
> currency subscription revenue growth for 2025.
>
> <Q: Jeffrey P. Meuler> Got it. And then on 2025 margin guidance, I hear you an
> opportunity for upside. But should we be thinking that wherever 2025 margin lands
> will be the fully rebased year to expand modestly from over time, consistent with
> the medium-term framework? And I ask because it sounds like you're still

reaccelerating sales headcount, still reimplementing growth investment, and you're not going to be fully back to the medium-term growth framework for GTS quota-bearing headcount in terms of the growth rate yet in 2025? So are we still likely going to be talking about I guess, needing to annualize that spend a year from now? Or is 2025 kind of the final margin reset?

<A: Eugene A. Hall> Thanks, Jeff. So I'd like to say, yes. I don't know what the year has in store for us in terms of the dynamism of the environment that we're operating in. But one way to sort of step back and think about it is the implied operating expense growth that we have baked into our 2025 plan and guide is around 9% year-over-year operating expense growth.

And that encompasses the growth we brought on board in 2024, particularly from a QBH perspective but across the company and the growth we have planned for 2025 with more normal phasing of that hiring. And so if revenue -- *and again, and we have modeled in our CV growth rate accelerating over the course of 2025.*

And so if 2025 ends up being a more again, "normal year," yes, I would say 2025 could be the new baseline. But again, given the dynamic world in which we operate, it's hard to call that right this moment.

. . .

Jason Daniel Haas – Wells Fargo Securities, LLC – Equity Analyst> Got it. That's helpful. And then there's also a comment earlier about an expectation. I know you don't guide to CV, but there's a comment about an expectation that CV growth would continue to accelerate. So I was hoping you could put a finer point on that. Are you saying that the 7.8% that you reported in 4Q, is that expected to be the bottom here and each quarter should be above that? Or could it potentially be more sort of rough path from here?

<A: Craig W. Safian> Yes. Jason, I think *the comment is more that over the course of 2025 and when we exit 2025, we would expect to be higher than 7.8%.* As we've talked about in the past, the CV growth rate may not go up in a precisely straight line or that the slope may not be precisely straight, *more so that the trend will be that it will exit 2025 higher than 7.8%.* And again, and with a *goal towards continuing to accelerate to first double digit and then to our medium-term objective of 12% to 16%.*

(Emphasis added).

<u>May 6, 2025</u>

26.    On May 6, 2025, Defendants issued a press release detailing the Company's Q1 results as follows:

9

**FIRST QUARTER 2025 HIGHLIGHTS**

- Revenues: $1.5 billion, +4.2% as reported; +5.7% FX neutral.
- Net income: $211 million, +0.2% as reported; adjusted EBITDA: $385 million, +0.7% as reported, +2.9% FX neutral.
- Diluted EPS: $2.71, +1.5%; adjusted EPS: $2.98, +1.7%.
- Operating cash flow: $314 million, +66.0%; free cash flow: $288 million, +73.3%.

27.    On the release, Defendant Hall was quoted as saying:

First quarter financial results were ahead of our expectations. ***Contract value grew 7%.*** In a dynamic world, we are managing our costs to deliver Adjusted EBITDA Margin ahead of our initial guidance while also investing for future growth. We continue to provide significant value to our clients and will emerge from the current environment even stronger.

(Emphasis added).

28.    During the same-day earnings call, Defendant Safian provided additional details on Gartner's results for the first quarter, in pertinent part as they relate to the Company's CV and consulting growth, as follows:

***First quarter contract value or CV grew 7% year-over-year***. Revenue, EBITDA, adjusted EPS and free cash flow were better than expected as ***we continue to execute well in an increasingly complex environment***. We were resilient in the quarter affected by macro factors

. . .

We are updating our guidance to reflect Q1 performance, the new macro landscape, the benefit from the move in FX rates and our own expense agility.

. . .

***Contract value was $5.1 billion at the end of the first quarter, up 7% versus the prior year***. Contract value and CV growth are FX-neutral. ***Excluding the U.S. federal government, CV grew 8%.*** Contract value growth with tech vendors continued to improve. Global CV was $63 million lower than Q4 2024 with around 80% of the change attributable to the U.S. federal government end market. CV growth was broad-based across practices, industry sectors, company sizes and geographic regions. Across our combined practices, all of the industry sectors, except 2 grew at high single-digit rates led by the energy, health care and manufacturing sectors.

*CV grew at high single-digit rates across all enterprise sizes except small, which grew low single digits*. We also drove double-digit or high single-digit growth in the majority of our top 10 countries. Canada, which represents about 3% of total CV, had a more challenging selling environment in the quarter. *Nearly all of our U.S. federal contracts will come up for renewal during 2025, with about 40% having transacted in Q1, the largest quarter of this calendar year.*

. . .

*Q1 consulting revenue was $140 million compared with $135 million in the year-ago period, of about 4% as reported and 5% FX neutral.*

(Emphasis added).

29.    Defendant Hall further highlighted broad guidance for the remainder of the year and highlighted the macroeconomic landscape driving such guidance, stating, in pertinent part:

For the remainder of 2025, we plan to grow sales head count in the mid-single digits, excluding directly impacted areas. This reflects our commitment to invest for future growth while delivering strong margins and free cash flow. *Our plan is to exit the current environment better, faster and stronger than before* with continued sales head count growth and a return to historically strong productivity *we're well positioned to accelerate growth as the external environment evolves. We expect to reaccelerate CV growth to our target of 12% to 16% when the macroeconomic environment returns to normal and we expect EBITDA margins to expand through the natural operating leverage in the business.*

Gartner has a highly diversified client base. *The U.S. federal government represents approximately 4% of our total contract value.* Our U.S. federal business has been impacted by the recent policy changes. Nearly all of our U.S. federal contracts are up for renewal in 2025. Roughly 40% of these were transaction in Q1, the largest quarter of the year and we renewed roughly half that business. We remain laser focused on creating and delivering value for our U.S. federal clients. As the U.S. federal government modifies and refines their priorities, we believe that we will be a core part of helping them achieve critical priorities such as cybersecurity, cost optimization, digital transformation and more.

(Emphasis added).

30.    Defendant Safian provided additional financial details for such guidance, pertinently providing the following information:

*Since we reported Q4 results in early February, the world has become significantly more dynamic. We are applying all the lessons we've learned from*

11

*prior challenging environments. **We are shifting our focus to the things our clients need the most in an extraordinarily uncertain operating environment. We're also remaining agile in managing our cost structure while also investing for future growth.***

. . .

***For consulting, we have more visibility into the next quarter or two based on the composition of our backlog and pipeline as usual.*** Given the shifts in the macro environment, we have been thoughtful about the outlook for the labor-based part of the business. Contract optimization has had several very strong years and the business remains highly variable. ***We've incorporated a prudent outlook for this part of the segment. Our base level assumptions for consolidated expenses have changed to reflect the revenue outlook.***

. . .

***Our updated 2025 guidance is as follows:*** we expect research revenue of at least $5.34 billion, which is FX-neutral growth of about 4%. This reflects subscription research revenue growth of about 5%. We expect conferences revenue of at least $625 million, which is FX-neutral growth of about 6%. ***We expect consulting revenue of at least $575 million, which is growth of about 2% FX neutral. The result is an outlook for consolidated revenue of at least $6.535 billion, which is FX-neutral growth of 4%.***

. . .

***Looking out over the medium term in a normal macro environment, our financial model and expectations are unchanged. With 12% to 16% research CV growth, we will deliver double-digit revenue growth***. There is operating leverage in the business, which allows us to expand margins. With gross margin expansion, sales costs growing about in line with CV growth and G&A leverage, we will deliver modest EBITDA margin expansion.

(Emphasis added).

31.    During the question-and-answer segment of the call, Defendants discussed the macro environment further, suggesting confidence in continued CV growth despite ongoing tariff uncertainties, in pertinent part:

<Q: Joshua K. Chan – UBS Investment Bank – Analyst> I was wondering if you could talk about the selling environment outside of federal. It seems like you're saying that the environment became more volatile. But I guess if I add back your the [ NIV ] impact that you gave for the federal government. It seems like the CV

ex federal was fairly similar to what you had in Q4. So just trying to triangulate the comment about volatility and then the relatively good ex federal CV growth?

<A: Eugene A. Hall> Josh, so the selling environment because of the federal government we talked about, and that was the main thing that impacted our results in Q1. *Outside of the federal government, it's not completely uniform in terms of the impact. So there are some companies that are more impacted, for example, by tariffs than others*. By the way, both U.S. as well as non-U.S. companies. And so the *companies that don't have a lot of tariff impact or other kinds of impact for policy changes, it's kind of business as usual in terms of decision-making*.

The ones that are more directly impacted, decision-making has slowed. *They're still buying. They're still renewing, but decision cycles have extended compared to what they were, say, Q4 of last year. So we still see the value. Our pipeline is actually very robust*, but decisions are taking longer to get than they would get in Q4 or all of last year basically.

<Q: Joshua K. Chan> Okay. That's great color. And then I guess, how are you thinking about your cost structure going forward because you clearly raised the guidance despite lowering the revenues. So could you kind of talk to, I guess, how the lower revenue, but then offset by your more prudent cost management is factoring into your increased margin guidance for the year?

<A: Craig W. Safian> Yes, Josh. So I mean, the way to think about that is we've proven over the last several years given all the things Gene outlined in his prepared remarks about the craziness in the macro and geopolitical environment and just how challenging it has been that we've been very agile in managing our expenses. And what I'd say now is given the U.S. Fed results and the impact that's having on the contract value growth and then some of the things Gene just outlined as well in terms of longer selling cycles and things like that, we're taking the opportunity to make sure that we are managing our operating expense base super prudently and super carefully.

But also making sure that we're investing in areas that we know support and drive future growth. *We're in a period right now where our CV is growing, call it, mid-to high single digits. Obviously, we firmly believe that we can be a 12% to 16% grower on the research business at a double-digit grower on the overall top line, and we want to make sure that we don't do anything that damages or impedes our ability to get back there when the economic situation is more "normal."*

And so what we're doing is, I'd call it like a slight belt tightening across the board as we're seeing a little bit of pressure in some areas, but also making sure that we're growing our selling capacity because we know that's a key ingredient going forward. So we're not chopping anything. We're not slamming on the brakes on anything. We're just being thoughtful and prudent and careful and also making sure that we're investing in areas that we know drive and support future growth.

. . .

<Q: Jeffrey Marc Silber – BMO Capital Markets Equity Research – MD & Senior Equity Analyst> I just wanted to go back to some of the mechanics regarding cancellation of contracts. I know on the federal government side, most of your contracts, if not all of them are one year, but I think you have a number of multiyear contracts outside of that. Can a client -- let's say I have a 2-year contract, can we, as a client cancel ahead of that? How much notice do I have to give you? Does it have to be around the anniversary date? Some of the specifics around that, if you can provide would be great.

<A: Craig W. Safian> Yes. Generally, Jeff, *a multiyear contract is a multiyear commitment with no out clauses or term for convenience rights within that contract. And so our multiyear contracts are true multiyear contracts*. They can be 2, 3 or even 5 years at some point, but the bulk of them are actually 2-year contracts. And so when a client -- and again, your point is right, the U.S. federal contracts are almost exclusively 1-year contracts. But our multiyear contracts are multiyear with no true out clauses in them.

And again, *we've been very focused on continuing to increase the proportion of multiyear contracts in our contract value base specifically for challenging macroeconomic times. And again, that's part of the resilience we baked into our business or engineered into our business so that short-term challenges from a macro perspective have a more muted impact on our overall results because of a focus on operational best practices like selling multiyear contracts.*

<Q: Jeffrey Marc Silber> Okay. That's helpful. And then you were kind enough to give us kind of the seasonality on renewals for the federal government. Can we get some similarity for the nonfederal government contracts? I know they vary, but any help would be great.

<A: Craig W. Safian> So I'd say, again, you can kind of see this in the external metrics as well. So *Client retention is holding up really well and looks pretty good. And will look even better or modestly better if we excluded U.S. Federal from* it. So retention rates broadly continue to look pretty good. I think the challenge and Gene alluded to this earlier, is our sales cycles from both a new logo perspective and also from an upsell perspective, have lengthened and that impacts the wallet retention numbers. And so you're seeing a little bit of that new business velocity impacting the lot retention numbers, but overall, the retention numbers are holding up pretty well. And again, you can see that in both the GTS and GBS client and wallet retention numbers.

<Q: Jeffrey Marc Silber> And is there a specific quarter where most of these contracts renewed.

<A: Craig W. Safian> ***Our 2 biggest quarters are Q1 and Q4 from an exploration perspective, Q2 and Q3 tend to be lighter quarters. But one of our practices is to when we have the opportunity to early renew things. And so that can move things around.*** But if you just look at the pure contract term dates or end dates, overweighted to Q1 and Q4, think like 26% or 27% and then a little underweighted in Q2 and Q3, think in the 22% to 23% of total range.

(Emphasis added).

32.    The above statements in Paragraphs 24 to 31 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated CV growth while also minimizing risk from seasonality, macroeconomic fluctuations, and tariff impacts, in particular. In truth, Gartner's optimistic reports of growth and ever-increasing contract value gains fell short of reality; the Company was simply unable to maintain its projected and expected growth trajectory. Despite claims of strength and adaptability in "challenging environments" and a "very robust" pipeline, Gartner's contract value growth, both including and excluding federal, fell 2%.

### *Gartner Reveals Second Quarter Earnings Highlighting the Company's*

### *Declining Ex-Federal CV Growth Rate*

### *August 5, 2025*

33.    On August 5, 2025, Defendants announced their second quarter fiscal 2025 results, in pertinent part, as follows:

**SECOND QUARTER 2025 HIGHLIGHTS**

- Revenues: $1.7 billion, +5.7% as reported; +4.6% FX neutral.
- Net income: $241 million, +4.9% as reported; adjusted EBITDA: $443 million, +6.6% as reported, +5.0% FX neutral.
- Diluted EPS: $3.11, +6.1%; adjusted EPS: $3.53, +9.6%.
- Operating cash flow: $384 million, +3.7%; free cash flow: $347 million, +2.0%.
- Repurchased 0.7 million common shares for $274 million.
- Board of Directors increased the share repurchase authorization by $700 million in July 2025.

15

- Began the rollout of AskGartner, our new AI-powered tool that gives clients an improved user experience by providing faster, more efficient access to our insights.

34.    Defendant Hall added, in pertinent part, that "Second quarter Revenue, Adjusted EBITDA, Adjusted EPS, and Free Cash Flow were ahead of expectations. ***Contract value grew 5%***" (emphasis added).

35.    Defendant Safian reiterated Gartner's second quarter's results during the earnings call that followed, in pertinent part:

> ***Second quarter contract value, or CV grew 5% year-over-year***. Revenue, EBITDA, adjusted EPS and free cash flow were better than expected. ***We remain highly focused on delivering extraordinary value to our clients. The challenging Q1 selling environment, which was affected by DOGE and tariff-affected industry spending changes, continued through the second quarter. We are updating our guidance to reflect the Q2 results and the outlook for the balance of the year.***
>
> . . .
>
> ***Contract value was $5 billion at the end of the second quarter, up 5% versus the prior year. Contract value and CV growth are FX-neutral. Excluding the U.S. federal government, CV growth was about 150 basis points faster at around 6%.*** Global NCVI in the quarter, excluding the U.S. federal government, was positive $13 million.
>
> CV growth was broad-based across practices, industry sectors, company sizes and geographic regions. Across our combined practices, all the industries, except public sector, grew at high single or mid-single digit rates. Energy, banking, transportation and health care led the growth. CV grew at mid-single or high single-digit rates across all commercial enterprise sizes.
>
> We drove double-digit growth in half of our top 10 countries. CV declined on a year-over-year basis in Canada and Australia, which combined represents around 6% of global contract value. Nearly all of our U.S. federal contracts will come up for renewal during 2025, with over 60% having transacted in the first half of the year. Dollar retention year-to-date was around 47%. At June 30, we had approximately $200 million of U.S. Federal CV.
>
> . . .

16

*Q2 Consulting revenue was $156 million compared with $143 million in the year ago period, up about 9% as reported and 6% FX neutral. Consulting contribution margin was 40% in the second quarter.*

(Emphasis added).

36.     Speaking to the results, Defendant Hall attempted to explain Gartner's declining CV growth rate, in pertinent part, as follows:

There are 2 things I'd like you to take away from today's discussion. First, AI is an important opportunity for Gartner across several dimensions. And second, *we're making adaptations that give us a clear path back to double-digit growth*.

. . .

Measures of CEO confidence fell to recessionary levels, among the fastest drops ever recorded. And in a Gartner survey, 78% of CEOs indicated they're implementing cost-cutting measures to safeguard performance. *We have a high degree of confidence in what caused these headwinds because we track the reason for every loss for both renewals and potential new business.*

The largest headwind in Q2 was with the U.S. federal government. Initiatives from the Department of Government Efficiency, or DOGE, made it more challenging for clients to purchase or renew many of our products. In addition, there were impacts from tariff policies.

*With the prospect of higher tariffs, many companies implemented strong cost-saving measures. Even companies not directly impacted by tariffs began implementing these measures. Purchase decisions that were previously made by functional leaders are now being escalated to the CFO or even the CEO. These changes occurred at a record pace, impacting our performance during Q2.*

One of Gartner's core strengths is agility in responding to change. So we're making adaptations to accelerate our performance going forward. With the U.S. federal government, we're ensuring we stay aligned to the changing priorities, especially improving efficiency. Of course, we'll also continue to support critical issues such as cybersecurity, and we're working with our clients to adjust to new procurement processes. *We're also adapting to industries impacted by changing tariffs. A portion of our clients are always interested in cost optimization. We have great expertise in helping clients on this topic. Clients highly value our guidance because it results in quantifiable cost savings.*

*Now with tariff changes, the number of clients interested in cost optimization has increased dramatically*. So we've expanded our capabilities, including certifying our client-facing associates on delivering these services. *We're also helping clients*

17

*determine how to optimally reconfigure supply chains for tariff changes. Even industries not directly impacted by tariffs will get strong value from enhanced cost optimization capabilities.*

(Emphasis added).

37.    Later in the call, Defendant Safian provided the Company's "updated" guidance for fiscal 2025.  Pertinently, consulting revenue remained unaltered in the guide:

*For Consulting, we have more visibility into the next quarter or 2 based on the composition of our backlog and pipeline as usual.* Contract optimization has had several very strong years and the business remains highly variable.

Our updated 2025 guidance is as follows. We expect Insights revenue of at least $5.255 billion, which is FX-neutral growth of about 2%. This reflects subscription Insights revenue growth of about 4%. We expect around $210 million of non-subscription revenue. We expect conferences revenue of at least $625 million, which is FX-neutral growth of about 5%. This is unchanged from last quarter. *We expect Consulting revenue of at least $575 million, which is growth of about 1% FX neutral. This is also unchanged from last quarter. The result is an outlook for consolidated revenue of at least $6.455 billion, which is FX-neutral growth of 2%.*

We now expect full year EBITDA of at least $1.515 billion, down $20 million from our prior guidance. This reflects margins of 23.5%, consistent with last quarter's outlook despite the lower revenue guidance. We expect 2025 adjusted EPS of at least $11.75, an increase from last quarter.

(Emphasis added).

38.    Defendant Safian further detailed management's reasons for confidence in repairing Gartner's CV growth rate, stating, in pertinent part:

Before we go to questions*, I will take you through some of the numbers related to our path back to double-digit CV growth. If recent retention and new business trends continue in the second half, we would exit this year with CV growth in the low to mid-single digit*s. This reflects DOGE, tariff-affected industry dynamics and tech vendors only part of the way back to normal spending. There are 4 primary categories, which will drive the return to double-digit growth.

First, most of our U.S. federal contracts will have come up for renewal this year. Removing the DOGE-related headwinds with no assumption for net growth next year will add back around 200 basis points of CV growth in 2026.

18

Second, as companies and tariff-affected industries get more clarity around trade policies, we expect them to get back to normal course planning and spending. This should add at least 100 basis points to growth.

Third, tech vendor remains on a path back to double digits. We are encouraged, in particular, with the improvement in the small tech vendor part of the business.

Within large tech vendors, the overall trend remains positive. The second quarter was affected by the timing of a few larger deals getting delayed and tariffs affecting some parts of the hardware subsegment. Continued reacceleration of tech vendor CV would add back another 100 basis points to growth.

Finally, we are focused on improving our operations to drive faster growth, even in challenging selling environments. This includes more focus on cost optimization insights, the continued rollout of AskGartner, the initiatives Gene discussed and more. *We expect to add as much as 100 to 200 basis points to growth from these initiatives and better overall execution. All these factors would get us to at least high single-digit growth in 2026, well on our way back to double-digit growth in 2027 and beyond.*

. . .

*Based on recent trends, as I mentioned, CV growth this year will be in the low to mid-single digits.* With the adaptations we are making and with the stabilization of our most acutely impacted end markets, we expect growth to accelerate next year and again in 2027.

(Emphasis added).

39.    Following the prepared remarks, Defendants fielded questions from Analysts regarding the significant slowdown of Gartner's ex-federal CV growth rate, as discussed in the following pertinent exchanges:

<Q: Andrew Owen Nicholas – William Blair & Company LLC – Analyst> Appreciate the build on the return to high single-digit or even double-digit CV growth. I wanted to ask specifically on the tariff-impacted industry piece. Is there anything you can do to kind of size what you've determined to be the tariff-affected industries? How much that represents in terms of CV? I think you said 100 basis points improvement next year from kind of some normalization there. Any more color or quantification on that front would be helpful.

<A: Craig W. Safian> Yes. Andrew, thank you for the question. *The way we've defined tariff impact in industries is not perfect, I will tell you. We've looked at industries that rely heavily on importing and exporting, and we've looked at really*

19

*ones focused here in the U.S. and those where the U.S. is a major trade partner. When we rolled that up around 35% to 40% of our CV fell into that category across both GTS and GBS.*

. . .

<Q: Brendan J. Popson – Barclays Bank PLC – Research Analyst> This is Brendan, on for Manav. *I just want to ask on the tariff commentary. I mean, we've had a lot of companies report, and it seemed like the view was that confidence that kind of returned by the end of the quarter, even though there was definitely some concerns earlier in the quarter and not necessarily huge strategy changes outside maybe a couple of industries*. So just seeing like kind of what's different about your business in this environment right now?

<A: Eugene A. Hall> I guess *what I'd say is that what we saw with our clients is what I described earlier, and this didn't change at the end of the quarter*, which is that companies worry about even with a -- on the low end of tariffs, like a 15% increase in tariffs, that they did not believe they could necessarily pass all that on to their clients. *And so wanted to cut costs so that they could help maintain both the client pricing as well as their margins. And so we saw clients very widely basically saying, look, we need to cut costs so that we can maintain our revenues and our margin structure*. And again, that didn't change through the quarter.

. . .

<Q: Joshua K. Chan – UBS Investment Bank – Analyst> I guess *considering the magnitude of the slowdown in the ex Fed business, I guess what's your level of conviction that this is really tariff related versus clients just pulling back and blaming tariffs because I can't imagine the existence of tariffs is that much of a surprise in Q2 versus Q1, right?* So I guess what's your confidence about tariffs being the precise driver there?

<A: Eugene A. Hall> Again, we track every single deal. And again, we have a well-developed system. We've done this for a long period of time, where *we track every single deal and we ask the clients, we asked our salespeople kind of what was the reason we won or what was the reason we lost*. We get into quite good detail. And so that's why we have confidence that what's driving this is and the tariff synergies, a real focus on reducing costs because that's what our clients are telling us.

And we also track escalations. And again, as I mentioned, whenever people are focused on costs, one of the first things they do is make clients escalate things from the functional leaders, the CHRO, the CFO, CIO -- sorry, to the CEO or the CFO. And that's exactly what we're seeing, which is -- again, we've seen that, as I mentioned before, in both the pandemic and in the recession in 2009. That's what we're seeing right now.

<A: Craig W. Safian> Sorry. And Josh, one other just add-on thing. As we're talking about the dynamics of the business, *I wouldn't characterize us saying the slowdown was completely attributable to tariffs and tariff affected industries. We're just trying to provide incremental color around what we're seeing in the business.* And because a large part of the economy and a large part of our client base are impacted by tariffs, we wanted to make sure we provide that incremental color around the business.

<A: Eugene A. Hall> And again, *due to the performance of the tariff-affected industries, it's much worse than the non-tariff affected industries.*

(Emphasis added).

40.     During the question-and-answer segment, Defendants additionally rejected the any potential impact from potential customers turning to AI as an alternative to utilizing Gartner's services, in pertinent part:

<Q: Jason Daniel Haas – Wells Fargo Securities, LLC – Equity Analyst> . . . as a follow-up question, this came up a few times. You talked about the fact that every time you had a cancellation, you find out what the reason why was. Are you able to give us any sense of what percentage of folks are citing usage of like a publicly available large language model and therefore, not consuming the Gartner subscription. Is that coming up at all? What percentage is that?

<A: Eugene A. Hall> Yes, that's one of the options, and *it's not material.* It's basically -- *it's essentially unmeasurable.*

(Emphasis added).

41.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the February 4 and May 6, 2025, earnings calls. On those calls, Defendants projected "CV continuing to accelerate during 2025" and claimed to have crafted contracts with "resilience" to cause macroeconomic events to have a "more muted impact" on the company's results. Conversely, Defendants highlighted a declining CV growth rate, blaming it on the macroeconomic impact of the tariffs, despite not cautioning a such following their announcement during the previous earnings call.

21

42. Investors and analysts reacted immediately to Gartner's revelation. The price of Gartner's common stock declined dramatically. From a closing market price of $336.71 per share on August 4, 2025, Gartner's stock price fell to $243.93 per share on August 5, 2025, a decline of about 27.55% in the span of just a single day.

43. A number of well-known analysts who had been following Gartner lowered their price targets in response to Gartner's disclosures. For example, Wells Fargo, while slashing their price target nearly 35% down to $225, notably focused its review on the CV miss: "IT beat on EPS but missed CV growth by a wide margin . . . IT delivered $3.53 EPS on 4.9% contract value (CV) growth vs. Street $3.32 on 6.4%. The analyst further highlighted the threat of AI to Gartner's growth, stating: "Mgmt. cited an immaterial headwind from clients dropping Gartner to use publicly available LLMs, but this is something we have started to hear more about and is worth watching, in our view."

44. Similarly, William Blair focused its analysis on the declining CV growth rate, highlighting that they "were not surprised to see shares down yesterday on account of the disappointing CV growth figure(s) and the incrementally worse selling conditions underlying them, the magnitude of the selloff (-28%) undoubtedly surpassed even our most pessimistic expectations." The analyst went on to note that "CV growth … was 150 basis points below our model and decelerated 180 basis points sequentially … Outside the U.S. federal government, the selling environment weakened for sectors both directly and indirectly impacted by tariff policy changes, driving tighter budgets more broadly."

45. The fact that these analysts, and others, discussed Gartner's shortfall and below-expectation growth suggests the public placed significant weight on Gartner's prior statements of confidence in accelerating its CV growth and those of resilience in the face of macroeconomic

instability. The frequent, in-depth discussion of the deceleration of Gartner's CV growth rate confirms that Defendants' statements during the Class Period were material.

46.   Notwithstanding Defendants' disclosures during the call, they continued to mislead investors by misrepresenting their understanding of the non-federal CV growth headwinds and their ability to meet projected results for the Consulting segment.  In doing so, Defendants deceptively claimed confidence in their data surrounding renewal slowdowns, pointing only to tariff headwinds and more general cost-cutting efforts.

*November 4, 2025*

47.   On November 4, 2025, the company reported Q1 results as follows:

**THIRD QUARTER 2025 HIGHLIGHTS**

- Revenues: $1.5 billion, +2.7% as reported; +1.2% FX neutral.
- Net income: $35 million, -91.5% as reported; adjusted EBITDA: $347 million, +1.9% as reported, -0.8% FX neutral.
- Diluted EPS: $0.47, -91.2%; adjusted EPS: $2.76, +10.4%.
- Operating cash flow: $299 million, -49.4%; free cash flow: $269 million, -52.3%.
- Repurchased 4.0 million common shares for $1.1 billion.
- Board of Directors increased the share repurchase authorization by $1 billion in September 2025.
- Completed the Beta launch of AskGartner, our new AI-powered tool that gives clients an improved user experience by providing faster, more efficient access to our insights, to licensed users globally.

48.   On the release, Defendant Hall commented that "Third quarter financial results were ahead of expectations. ***Contract value grew 3%, or 6% excluding the US Federal business***. We increased our Adjusted EBITDA and margin guidance for the year and ***continue to expect CV to accelerate in 2026***. Seeing extraordinary value and a unique opportunity, we repurchased more than $1 billion of stock, a Gartner record for a single quarter" (emphasis added).

49.   An earnings call was conducted shortly after the release was published. During the call, Defendant Safian again delivered an update on both the Company's financial performance

and its projected expectations.  In pertinent part, Defendant Safian discussed the Company's CV

growth performance as follows:

> Third quarter contract value, or ***CV, grew 3% year-over-year. Excluding the U.S. federal government, CV grew 6%. Financial results in the third quarter were better than expected, and we are increasing our guidance for the full year.***
>
> . . .
>
> ***Excluding the U.S. federal government, CV growth was about 270 basis points faster at around 6%.*** Global NCVI in the quarter, excluding U.S. federal government, was positive $62 million, a sequential increase of $49 million from Q2. This $49 million improvement is larger than the sequential improvement from Q2 to Q3 last year.
>
> CV growth was broad-based across practices, industry sectors, company sizes and geographic regions. ***Across our combined practices, all the industries, except public sector grew at mid-single-digit rates***. Energy, transportation and banking led the growth. ***CV grew at high single-digit or mid-single-digit rates across all commercial enterprise sizes***. We drove double-digit or high single-digit growth in more than half of our top 10 countries.

(Emphasis added).

50.     Similarly, Defendant Safian pertinently discussed the performance of Gartner's

Consulting segment:

> Q3 consulting revenue was $124 million compared with $128 million in the year ago period. FX was a benefit of about 200 basis points in the quarter. Consulting contribution margin was 29% in Q3.

51.     Finally, Defendant Safian provided investors with an updated financial outlook for

the Company's fourth quarter and full fiscal year, in pertinent part, as follows:

> ***We are increasing our full year guidance to reflect recent performance and trends***.
>
> . . .
>
> Our updated 2025 guidance is as follows. We expect Insights revenue of at least $5.06 billion, which is an increase from last quarter and is FX-neutral growth of about 4%. We expect Conferences revenue of at least $630 million, which is an increase from last quarter and is FX-neutral growth of about 6%. ***We expect***

24

***Consulting revenue of at least $575 million, which is growth of about 2% FX neutral. This is unchanged from last quarter***. We continue to expect at least $210 million of Other revenue. The result is an outlook for consolidated revenue of at least $6.475 billion, which is an increase from last quarter and is FX-neutral growth of 3%.

. . .

***Our financial results in Q3 were ahead of expectations***, and we've increased the guidance for 2025. ***Contract value, excluding U.S. federal business, grew 6% in the quarter. Third quarter contract renewal rates***, excluding the U.S. federal government, ***improved from Q2***, and we saw a year-over-year increase in our sequential NCVI improvement. ***We are positioned to accelerate CV growth in 2026 on a path to long-term sustained double-digit growth in 2027 and beyond***.

(Emphasis added).

52.    Pertinently, again, Defendant Safian claimed that "[f]or ***Consulting, we have more visibility into the next quarter or 2*** based on the composition of our backlog and pipeline as usual" (emphasis added).

53.    During the question-and-answer segment, defendants discussed Gartner's CV growth expectations further, in response to the following pertinent inquiries:

<Q: Andrew Owen Nicholas – William Blair & Company LLC – Analyst> It sounds like the selling environment is a little bit better than last quarter, some positive trends. I think last quarter, you talked about the tariff-impacted industries specifically. Can you give an update on maybe CV growth there relative to the rest of the business?

<A: Craig W. Safian> Andrew, ***so the non-tariff affected industries, as we track them, continue to perform about 200 basis points faster from a CV growth perspective than the tariff affected***. So maybe a little smidge better than the gap we saw in Q2, but by and large, about the same performance-wise compared to Q2.

<Q: Andrewn Owen Nicholas> Okay. I guess just as a follow-up to that, does that give you any pause in terms of your expectation for improvement next year, ***I think part of the ramp back up to high single-digit plus in contract value growth in '26 is kind of alleviation of that headwind.*** Just kind of curious how you're thinking about that or if we should be applying some conservatism to that number given how things have trended over the past couple of months.

<A: Eugene A. Hall> *So I'd say the selling environment with tariff impacted companies is starting to improve*. When there was more -- even more uncertainty with tariffs, if we went back a few months ago, companies were reluctant to make purchase decisions. *And what we see now is there's more certainty with regard to tariffs in certain geographies. And because of that now, our clients are starting to make decisions they were unable to make before.*

And so I'd sort of characterize as the tariff impact industries actually, I think next year, *I expect we'll be actually doing better because there's more tariff certainty and clients are how do you deal with it?* And they still need help with AI, cybersecurity, data analytics, all that kind of stuff. And so I'd say there's a marked improvement in the tariff impacted industry's ability to make decisions to buy.

. . .

<Q: Keen Fai Tong – Goldman Sachs Group, Inc. – Research Analyst> I want to see if you can elaborate on what your *expectations are for how the trajectory of CV improves, if you expect essentially a bottoming in the fourth quarter and then the reacceleration across all of 2026 exiting the year in the high single digits*. Just some additional color on the trajectory and pacing of improvement would be great.

<A: Craig W. Safian> George, it's Craig. So we'll provide more color on 2026 in February when we do our Q4 earnings and do our initial guide for 2026. *You're right from a headline perspective in terms of our expectations, which is to reaccelerate over the course of 2026 into the high single-digit growth rates.* And then obviously, our job is not just that 1 year, but to continue to accelerate the CV beyond that back into double-digit growth and then ultimately into our medium-term objective range.

As we've talked about in the past, the growth can be lumpy, just it's based on math and based on ups and downs in that business that pushes or business that comes in sooner than we expect. Obviously, the compares in the first half of the year are favorable from a CV growth perspective. But we fully expect to accelerate over the course of 2026 into the high single-digit range.

(Emphasis added).

54.    The above statements in Paragraphs 33 to 53 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to Gartner's CV growth potential and projected Consulting segment revenue outlook while also minimizing risk from seasonality and macroeconomic fluctuations. Defendants highlighted that the environment among "tariff impacted companies" was "starting to improve,"

generating "more certainty" in the demographics.  This allegedly would result in the opportunity for continued CV growth for Gartner. Conversely, while tariff impacts continued to ease and settle and companies were acting with more certainty, Gartner's non-federal CV growth would fall even further as its Consulting segment revenue faltered below Gartner's long-held projections.

***The Full Truth Emerges during Gartner's Fourth Quarter 2025 Earnings Report***

*<u>February 3, 2026</u>*

55.    In the morning of February 3, 2026, Defendants published their fourth quarter and full year results for fiscal 2025, in pertinent part, as follows:

FOURTH QUARTER 2025 HIGHLIGHTS

- Revenues: $1.8 billion, +2% as reported and unchanged FX neutral.
- Net income: $242 million, -39%; adjusted EBITDA: $436 million, +5% as reported, +1% FX neutral.
- Diluted EPS: $3.36, -34%; adjusted EPS: $3.94, -28%.
- Operating cash flow: $295 million, -12%; free cash flow: $271 million, -13%.
- Board of Directors increased the share repurchase authorization by $500 million in January 2026.

FULL YEAR 2025 HIGHLIGHTS

- Revenues: $6.5 billion, +4% as reported and +3% FX neutral.
- Net income: $0.7 billion, -42%; adjusted EBITDA: $1.6 billion, +4% as reported, +2% FX neutral.
- Diluted EPS: $9.65, -40%; adjusted EPS: $13.17, -7%.
- Operating cash flow: $1.3 billion, -13%; free cash flow: $1.2 billion, -15%.
- Repurchased 7.0 million common shares for $2.0 billion; 8% reduction in outstanding share count YoY.

56.    During the same-day earnings call, Defendant Safian provided more detail on the financial results, in pertinent part, discussing Gartner's CV growth as follows:

Fourth quarter revenue was $1.8 billion, up 2% year-over-year as reported and unchanged FX neutral. For the full year, revenue was $6.5 billion, up 4% as reported and 3% FX neutral. ***Fourth quarter contract value or CV grew 1% year-over-year. Outside the U.S. federal government, CV grew 4%.*** In the quarter, total contribution margin was 67%, up 85 basis points from last year.

. . .

> ***Contract value was $5.2 billion at the end of the fourth quarter, up 1% versus the prior year. Outside the U.S. federal government, CV growth was about 330 basis points faster at around 4%.*** Global NCVI in the quarter outside the U.S. federal government was positive $147 million. The vast majority of our U.S. federal contracts came up for renewal during 2025. At December 31, we had $126 million of U.S. federal CV.
>
> Outside the U.S. fed, we delivered CV growth across practices, industry sectors, company sizes and geographic regions. By sector, energy, banking and technology led the growth. CV grew at high single-digit or mid-single-digit rates across all commercial enterprise sizes. All but 2 of our top 10 countries grew in 2025 with 1 growing double digits. And we had more than $400 million of new business in the fourth quarter.

(Emphasis added).

57.    Defendant Safian further clarified the Company's underperformance in the Consulting segment, highlighting, in pertinent part:

> ***Q4 Consulting revenue was $134 million compared with $153 million in the year ago period.*** FX was a benefit of about 300 basis points in the quarter. Consulting contribution margin was 27% in Q4. ***Full year Consulting revenue was $552 million compared to $559 million in the prior year***. Contribution margin was 34%.

(Emphasis added).

58.    Defendant Safian additionally provided Gartner's financial outlook for fiscal 2026, pertinently, as follows:

> Our 2026 guidance is as follows. We expect Insights revenue of $5.19 billion or more, which is FX-neutral growth of about 1%. We expect Conferences revenue of $695 million or more, which is FX-neutral growth of about 7%. We expect Consulting revenue of $570 million or more, which is growth of about 3% FX neutral. ***The result is an outlook for consolidated revenue of $6.455 billion or more, which is FX-neutral growth of 2%***. We expect full year EBITDA of $1.515 billion or more. This reflects full year margins of 23.5% or more.

(Emphasis added).

28

59.    The aforementioned press releases and statements made by the Individual Defendants contradicted their earlier statements, including those made during the August 5 and November 4, 2025, earnings calls. During those calls, the Defendants initially walked back on Gartner's CV growth potential for the year, before highlighting allegedly improved performance on the November 4, 2025 call.   Defendants portrayed an understanding of the source of the reduction in the growth of Gartner's contract value among its non-tariff impacted customer base and further portrayed an improving environment in the back half of the year as the "selling environment … start[ed] to improve."  Defendants further continued to portray confidence in their revenue and growth expectations for the Consulting segment throughout the entirety of the class period.

60.    Investors and analysts again reacted promptly to Gartner's revelations. The price of Gartner's common stock declined dramatically. From a closing market price of $202.40 per share on February 2, 2026, Gartner's stock price fell to $160.16 per share on February 3, 2026, a decline of nearly 20.87% in the span of one day.

61.    Well-known analysts following Gartner again lowered price targets in response to these new disclosures. For example, UBS, while cutting their price target by a third down to $180, pointed to the CV growth rate as a key source of disappointment for investors, noting "Gartner shares -21% on Tuesday after Q4 CV moderated to +0.8% . . . and management abandoned the +HSD% 2026 CV growth framework."  The analyst continued: "CV growth was worse, there's still limited near-term visibility to ex. Fed CV going forward, and structural AI questions remain unanswered."

62.    William Blair's analyst was in accord, noting CV growth "decelerated 220 basis points sequentially."  Speaking to the non-federal component, the analyst summarized Gartner's

29

position as follows: "Outside the federal government vertical, management noted a tougher selling environment, with increased deal scrutiny, elevated deal approval authority, and longer sales cycles." The analyst went on to note that, while the 2026 guidance provided points to "growth accelerating" "management was unwilling to commit to the high-single-digit growth potential theorized on its second quarter earnings call." Further in the report, the analyst discussed the other arms of the business, noting in particular the Consulting segment's shortfall, in pertinent part:

> Consulting revenue ($24 million below our model) declined 14.6% in constant currency, with softness driven by both labor based consulting (-13% as reported) and contract optimization (-14% as reported). Consulting backlog was $174 million, down 9% year-over-year.

63.     The fact that these analysts, and others, discussed Gartner's continued CV shortfall and further significant miss to its Consulting segment suggests the public placed significant weight on Gartner's statements of prior confidence in growth trajectory and revenue expectations. The frequent, in-depth discussion of Gartner's shortfalls against market expectations confirms that Defendants' statements during the Class Period were material.

### *Additional Scienter Allegations*

64.     During the Class Period, Defendants acted with scienter in that they knew, should have known, or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of Gartner were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning the purchasing power, decision-making, and alternative priorities of its customer base such that it would impact Gartner's ability to accelerate the growth of its CV rate and facilitate the achievement of its Consulting segment guidance.

65.     Notwithstanding such, Defendants repeatedly and affirmatively represented to investors that Gartner was well positioned to continue to grow its CV rate despite economic

30

disruptions. Defendants further never cautioned investors as to the possibility that the Company's CV rate, both including and excluding federal contracts, would begin to aggressively decline.

66.     Yet, Defendants made selective and misleading disclosures in repeated claims of stability against macroeconomic pressures and tariff headwinds, in particular. Indeed, after the United States' significant tariffs were announced, Defendants held an earnings call on May 6, 2025, touting how they "continue to execute well" and planned to 'exit the current environment better, faster, and stronger than before."

67.     Defendants' scienter was further evidenced following the partial corrective disclosure, when Defendants, after acknowledging some impact from tariffs on its non-federal CV growth during Gartner's August 5, 2025, call, claimed their clients were "starting to make decisions they were unable to make before" as the "selling environment with tariff impacted companies [was] starting to improve."  Defendants further highlighted an improvement in contract renewal rates in the third quarter and claimed to be "positioned to accelerate CV growth in 2026."

68.     Defendants made such claims without acknowledging any continued decline in the value of such contracts with increased renewal rates. Defendants were aware of the risks to their CV growth, yet they continued to deliberately disregard or otherwise minimize them in their claims of confidence to investors.

69.     Furthermore, at no point during the class period did Defendants' caution any risk or provide any indication of a slowdown in their Consulting segment, despite being uniquely positioned to be able to observe trends in the segment.

70.     Moreover, considering the disappointing outcome was ultimately significantly blamed on the ongoing tariff and macroeconomic headwinds, Defendants' repeated statements of confidence, growth, and revenue expectations were, at best, deliberately reckless.

***Loss Causation and Economic Loss***

71.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Gartner's common stock and operated as a fraud or deceit on Class Period purchasers of Gartner's common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Gartner's common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Gartner's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

72.    Gartner's stock price fell in response to the partial corrective event on August 5, 2025, as alleged supra. On August 5, 2025, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Gartner's forecasting processes and growth guidance.

73.    In particular, on August 5, 2025, Gartner announced significantly below-market growth expectations, including a significant decline in non-federal contract value growth rates, from 8% to 6% sequentially.

74.    Gartner's stock price fell again in response to the final corrective event on February 3, 2026, as alleged *supra*. On February 3, 2026, Defendants disclosed additional information that was directly related to previous and additional misrepresentations and material omissions concerning Gartner's forecasting process and growth projections related to both the Company's contract value growth and its consulting segment's performance.

75.    In particular, on February 3, 2026, Gartner announced a significant miss to its consulting segment's revenue performance against both internal and external expectations, as well as a surprising further decline in non-federal contract value growth rates, from 6% to 4% sequentially.

### *Presumption of Reliance; Fraud-On-The-Market*

76.    At all relevant times, the market for Gartner's common stock was an efficient market for the following reasons, among others:

(a)    Gartner's common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)    Gartner communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)    Gartner was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)    Unexpected material news about Gartner was reflected in and incorporated into the Company's stock price during the Class Period.

77.    As a result of the foregoing, the market for Gartner's common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Gartner's stock price. Under these circumstances, all purchasers of

33

Gartner's common stock during the Class Period suffered similar injury through their purchase of Gartner's common stock at artificially inflated prices, and a presumption of reliance applies.

78.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

79.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with growth projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for decelerations in Gartner's growth rate or declines in its business and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

80.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

81.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the

"forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Gartner who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

82.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Gartner's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

83.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Gartner's common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Gartner or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in

35

securities class actions. As of February 5, 2026, there were 70.45 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

84. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

85. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

86. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Gartner;

(c) whether the Individual Defendants caused Gartner to issue false and misleading financial statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e) whether the prices of Gartner's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

36

(f)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

87.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

88.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

89.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

90.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Gartner common stock;

37

and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Gartner's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

91.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Gartner's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

92.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

93.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Gartner's internal affairs.

94.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Gartner's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Gartner's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Gartner's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

95.    During the Class Period, Gartner's common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Gartner's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Gartner's common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Gartner's common stock

declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

96.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

97.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

98.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

99.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Gartner's misstatements.

100.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Gartner which had become materially false or misleading.

101.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Gartner disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Gartner to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Gartner's common stock.

102.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Gartner to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

103.    By reason of the above conduct, the Individual Defendants and/or Gartner are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

41

C.      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: March 17, 2026                               Respectfully submitted,

                                                    **LEVI & KORSINSKY, LLP**


                                                    */s/ Shannon L. Hopkins*
                                                    Shannon L. Hopkins
                                                    1111 Summer Street, Suite 403
                                                    Stamford, CT 06905
                                                    Tel.: (203) 992-4523
                                                    Fax: (212) 363-7171
                                                    Email: shopkins@zlk.com

                                                         -and-

                                                    Adam M. Apton
                                                    (*pro hac vice* forthcoming)
                                                    33 Whitehall Street, 27th Floor
                                                    New York, NY 10004
                                                    Tel.: (212) 363-7500
                                                    Fax: (212) 363-7171
                                                    Email: aapton@zlk.com

                                                    *Attorneys for Plaintiff*

42