**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

KEVIN SCHMIDT, Individually and on behalf of all others similarly situated,

Plaintiff,

vs.

GARTNER, INC., EUGENE A. HALL, and CRAIG SAFIAN,

Defendants.

No. 3:26-cv-00394 (OAW)

**CLASS ACTION**

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

July 27, 2026

**TABLE OF CONTENTS**

**Page**


I. NATURE OF THE ACTION ........ 2

II. JURISDICTION AND VENUE ........ 7

III. PARTIES ........ 7

A. Plaintiffs ........ 7

B. Defendants ........ 8

C. Relevant Non-Parties: Former Gartner Employees ........ 10

IV. SUBSTANTIVE ALLEGATIONS OF FRAUD ........ 15

A. Background ........ 15

1. Overview of Gartner's Business ........ 15

2. Gartner's Most Critical Business Segment: Research ........ 16

3. Gartner's Most Important Financial Metric: Contract Value (CV) ........ 18

B. Before the Class Period, Defendants Repeatedly Denied that Generative AI Would Disrupt Gartner's Research Business ........ 20

C. Defendants Misled Investors About CV Growth and the Competitive Threat Posed by Generative AI ........ 22

1. Former Gartner Employees Demonstrate Gartner Experienced Reduced Demand, Attrition, and Lower Spending Throughout 2024 ........ 24

2. Defendants Closely Tracked Reduced Demand and Retention Problems 29

D. While Misleading Investors, the Individual Defendants Unloaded Their Gartner Stock ........ 34

E. Beginning in 2025, as Contract Cancellations and Reduced Spending Worsened, Defendants Offered Price Concessions to Retain Research Clients ... 36

1. The Research Segment Experienced Worsening Demand and Retention Problems ........ 37

2. Defendants Sacrificed CV Growth to Retain Clients by Offering Price Concessions ........ 42

F. In April 2025, Defendants Created a Cancel Council to Diagnose Mass Contract Cancellations ........ 43

G. Defendants Continued to Mislead Investors About the Demand for the Research Segment on May 6, 2025 ........ 45

H. The Truth Began to Emerge on August 5, 2025 as Gartner Reported Declining CV Growth ........ 46

I. Defendants Reassured Investors and Denied Seeing Any Impact from AI on Gartner's Business ........ 47

J. The Truth Was Further Revealed on November 4, 2025, as Gartner Disclosed Worsening CV Growth Deceleration, and Defendants Continued to Deny Any AI Disruption ........ 49

K. The Full Truth was Finally Revealed on February 3, 2026 When Defendants Announced the Lowest CV Growth in a Decade ........ 50

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ........ 52

A. July 30, 2024 – Q2 2024 Earnings Call ........ 53

B. November 5, 2024 – Q3 2024 Earnings Call ........ 54

C. February 4, 2025 – Q4 2024 Earnings Call ........ 56

D. May 6, 2025 – Q1 2025 Earnings Call ........ 59

E. August 5, 2025 – Q2 2025 Earnings Call ........ 60

F. November 4, 2025 – Q3 2025 Earnings Call ........ 62

VI. LOSS CAUSATION AND ECONOMIC LOSS ........ 63

A. August 5, 2025 – First Partial Corrective Disclosure/Materialization of the Risk ........ 65

B. November 4, 2025 – Second Partial Corrective Disclosure/Materialization of the Risk ........ 66

C. February 3, 2026 – Final Corrective Disclosure/Materialization of the Risk ........ 68

VII. ADDITIONAL INDICIA OF SCIENTER ........ 71

A. Defendants Closely Tracked and Monitored Relevant Information That Contradicted Their Public Statements ........ 71

1. Defendants Tracked Every Contract at the Deal Level ............................ 71

2. Defendants Tracked Customers That Left or Reduced Spending Because of AI.......................................................................................... 72

3. Defendants Had High Visibility into CV Growth, Renewal, and Revenue.................................................................................................. 74

B. Former Employees Confirm Defendants Reviewed Information Contrary to Their Public Statements ........................................................................... 75

1. Defendants Tracked Contract Renewals Through the Growth and Retention Team and Win Rooms ........................................................... 75

2. Defendants Established the Cancel Council to Monitor and Diagnose Contract Cancellations ................................................................. 76

3. Defendants Monitored and Tracked Demand and Retention Problems Through Internal Systems, Reports, and Meetings .................................. 76

C. Gartner's Research Segment Was Responsible for Nearly All of Gartner's Total Revenue ........................................................................................ 78

D. The Individual Defendants' Suspicious Stock Sales Support and Inference of Scienter ................................................................................................ 80

VIII. INAPPLICABILITY OF STATUTORY SAFE HARBOR ........................................... 83

IX. CONTROL PERSON ALLEGATIONS.......................................................................... 84

X. CLASS ACTION ALLEGATIONS ................................................................................ 86

XI. PRESUMPTION OF RELIANCE .................................................................................. 88

XII. CAUSES OF ACTION ................................................................................................... 90

COUNT I FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER (Against Defendant Gartner and the Individual Defendants)................................................................................................ 90

COUNT II FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT (Against Defendants Hall and Safian) ........................................................................................ 91

XIII. PRAYER FOR RELIEF ................................................................................................ 92

XIV. DEMAND FOR TRIAL BY JURY ................................................................................ 93

Lead Plaintiff Arkansas Teacher Retirement System ("ATRS" or "Lead Plaintiff") and Additional Plaintiff New England Teamsters Pension Fund ("New England Teamsters" or "Additional Plaintiff" and together with Lead Plaintiff, "Plaintiffs"), by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the U.S. Securities Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange Commission (the "SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all others similarly situated who purchased or otherwise acquired the publicly traded common stock of Gartner, Inc. ("Gartner," or the "Company") between July 30, 2024 and February 2, 2026, inclusive (the "Class Period"), subject to certain exclusions described in ¶281 below.

Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief are based on, among other things, the independent investigation of Court-appointed Co-Lead Counsel Labaton Keller Sucharow LLP and Cohen Milstein Sellers & Toll LLP. This investigation has included, among other things, a review and analysis of: (i) public filings by Gartner with the SEC; (ii) public reports and news articles; (iii) research reports by securities and financial analysts; (iv) economic analyses of securities movement and pricing data; (v) transcripts of investor calls with Gartner's senior management; (vi) publicly available legal proceedings; (vii) an investigation conducted by and through Plaintiffs' attorneys, including but not limited to interviews and discussions with former Gartner employees; and (viii) other publicly available material and data identified herein.

Co-Lead Counsel's investigation regarding the factual allegations contained herein is ongoing, and many of the facts supporting the allegations contained herein are known only to the Defendants (as defined herein) or are exclusively within their custody or control. Plaintiffs believe

that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This action arises from Defendants' false and misleading statements to investors about the demand for Gartner's services amid the rise of artificial intelligence ("AI") and the grave competitive threat AI posed to Gartner's business and growth prospects.

2. Gartner is a research and advisory company that charges clients subscription fees for access to its research content across 12 practice areas, including Information Technology, Human Resources, and Supply Chain. Gartner has spent years touting that subscription model, which drives more than 75% of Gartner's revenue, as the foundation for consistent and predictable growth.

3. Given the importance of its subscriptions to the health of its business, Gartner tracks its performance mainly with a number it calls Contract Value, or "CV," which Gartner says is the "single most important performance metric" for the Company and the "most important driver" of its profit growth. For years before the Class Period, Gartner reported consistent CV growth in the double digits, peaking at more than 14% in 2022.

4. But in the fall of 2022, OpenAI released ChatGPT, a generative AI tool that threatened to do what Gartner charged clients tens of thousands of dollars to do: synthesize mountains of information into actionable insights on demand. Investors took notice, worried that generative AI tools like ChatGPT and others would render Gartner's core research offerings obsolete.

5. In the months that followed, Gartner's CV growth steadily fell, quarter after quarter, declining to just 6.9% by the first quarter of 2024. Defendants, however, blamed transitory macroeconomic and industry headwinds for its falling CV growth and, as analysts reported, denied

that AI was even "a potential threat to its business." The market believed Gartner, with analysts repeatedly concluding that AI was not a threat to Gartner's business. For example, just prior to the start of the Class Period, on May 13, 2024, Morgan Stanley Research echoed Defendants' statements, stating: "Gartner does not see Gen AI as a potential threat to its business."

6. On July 30, 2024, the first day of the Class Period, Gartner announced its first year-over-year CV growth increase since the first quarter of 2022. Defendant Craig Safian, the Company's Chief Financial Officer, declared the turnabout as proof that the first quarter of 2024's CV growth of 6.9% "***marked the bottom for CV growth***." Three months later, on November 5, 2024, Defendant Safian even doubled down, assuring investors that Gartner had seen "***nothing different from a client spending or an end market perspective***." These statements reassured investors that, based on what Defendants had observed internally, Gartner's business was thriving and that AI was not a threat to Gartner's continued growth.

7. That was false. At least 13 former well-placed Gartner employees, who served across multiple divisions at Gartner, confirm that as early as July 2024—just as Defendant Safian was publicly declaring victory and touting CV growth—customers were privately already questioning Gartner's value, refusing to renew contracts, and slashing their spending. The primary reason, as Gartner's own sales representatives heard firsthand, was that customers could get comparable research insights from tools like ChatGPT at a fraction of the cost.

8. Defendants knew that AI was increasingly causing reduced demand and lower spending, which was eating into the Company's CV growth. As Gartner's Chief Executive Officer, Defendant Eugene Hall, explained, the Company had a "well-developed system" for monitoring "every single deal," which tracked the "reason for every loss." Indeed, Defendant Hall publicly

stated that "we ask each salesperson to document any concerns clients have" including "if a client brings up that AI might be a substitute."

9. But throughout the Class Period, Defendants concealed these facts from investors and created the misleading impression that AI was not a threat to Gartner's business. Defendants also repeatedly assured investors that based on internal data, the Company's CV growth would continue to grow in 2025.

10. Matters only worsened by 2025, as former employees consistently recount how the Company's internal tracking systems and metrics were raising alarm bells, with widespread cancellations and spending reductions across Gartner's research business. The losses were mounting so fast that, come April 2025, Gartner created a "Cancel Council" to dissect the damage deal by deal. In one meeting, for example, a sales manager walked the Council through a large account that had slashed its contract in half to approximately $1 million after concluding that AI could provide similar information at a fraction of Gartner's price.

11. Desperate to stem the bleeding, Gartner abandoned its longstanding practice of mandating price increases at renewal, directed sales representatives to prioritize client retention over CV growth, and pushed early renewals that cannibalized future revenue to prop up the present.

12. Despite these flashing alarm bells, on May 6, 2025, during the Company's Q1 2025 earnings call, Defendant Safian assured investors that "***client retention is holding up really well***" and cited macroeconomic factors as the only temporary headwinds impacting the Company. Defendant Safian's statements, however, were false and misleading. In truth, Defendants knew that AI—not macroeconomic factors—was the largest threat to Gartner's business. They knew that by that time the rapid adoption of AI had already caused lower demand, contract cancellations, and reduced customer spending, and that this threat was not temporary, but existential to Gartner's

business. Given this, Gartner secretly changed course and chose to offer price concessions simply to retain existing customers at a fraction of their former contract value.

13. The market again believed Defendants that the Company was not facing an AI-related threat to its business model and was merely dealing with temporary, macroeconomic headwinds. For example, on May 7, 2025, Goldman Sachs Research observed that "Gartner is seeing steady Research CV growth in the high-single-digits among enterprise functional leaders ex[cluding] federal government despite macro uncertainty, an affirmation of the company's essential product offerings and resilient business model." The market would soon learn that this was simply not true. But before they did, Defendants Hall and Safian sold their stock for proceeds of more than $68 million.

14. Less than three months later, the truth was partially revealed on August 5, 2025, when Gartner reported that in the second quarter of 2025, CV growth had declined to just 4.9%, falling well below the "bottom" that Defendant Safian had promised investors just one year before and adding fuel to the fire concerning AI disruption. The market reacted immediately: Gartner's stock cratered more than 27% in a single trading day, closing at $243.93 per share—the largest one-day percentage drop in the Company's history.

15. During the earnings call the same day, analysts pressed Defendants Hall and Safian directly about AI's role in the Company's declining CV growth, asking directly whether customers were raising AI as a potential alternative to Gartner's services. Defendants denied it outright, insisting there was not any "***reduced demand***" from AI, that any AI-driven disruption was "***not material***," and that the number of customers leaving Gartner because of AI was so small as to be "***essentially unmeasurable***." Three months later, when Gartner disclosed in November 2025 that

CV growth had fallen further to just 3%—triggering another 7% stock drop—Hall doubled down, dismissing the number of clients even considering AI instead of Gartner as "***extremely small***."

16. Based on their false and misleading statements that AI was not a threat to Gartner's business or growth, investors were reassured (for the time being), believing that the Company's declining CV growth was cyclical and primarily caused by macroeconomic factors—not the existential threat of AI. For instance, after the August 5, 2025 earnings call, Wells Fargo echoed Defendants' optimism that the "headwind from client[s] dropping Gartner to use publicly available LLMs" was "immaterial." Similarly, RBC Capital Markets wrote on September 8, 2025, that although "[i]nvestors remain concerned that deep research capabilities from [AI] could disrupt Gartner's competitive position . . . [i]n our view, the recent weakness is largely cyclical."

17. Unfortunately for investors, the declining CV growth was not merely cyclical, and the truth was fully revealed on February 3, 2026, when Gartner disclosed that fourth-quarter 2025 CV growth had collapsed to just 0.8%—the slowest growth in a decade—and admitted that "a much tougher selling environment" was to blame. Investors understood exactly what that meant: Gartner was not facing a transient problem, but an existential threat to its core business from AI. On the news, Gartner's stock plunged another 20.87% in a single day, closing at $160.16 per share, down from $202.40 the previous day.

18. Analysts wasted no time confirming what Gartner had just conceded. As Wells Fargo bluntly put it on February 4, 2026: "the miss reflects AI-driven pressure, with clients downsizing contracts in favor of LLM tools." Similarly, an article from MarketWatch noted that, "Gartner closed at their lowest level in five years, underscoring how artificial intelligence is disrupting the landscape for professional research and consulting." The article further noted that "[t]he company's commentary on the market backdrop signaled sustained challenges due to AI."

19. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Gartner's securities, Plaintiffs and Class members have suffered significant losses and damages. This action seeks to recover for investors those losses.

## II. JURISDICTION AND VENUE

20. The claims asserted herein arise pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

21. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

22. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Gartner maintains its principal executive offices at 56 Top Gallant Road, Stamford, Connecticut, within this District, and is thus found and transacts business here. Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

23. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Plaintiffs

24. Lead Plaintiff ATRS has been providing retirement benefits to Arkansas's public school and education employees since 1937. ATRS is a defined benefit retirement plan established by state law with approximately $23 billion in total assets, as of June 30, 2025. ATRS is headquartered in Little Rock, Arkansas, and is administered as a "qualified" government

sponsored retirement plan under the provisions of Internal Revenue Service Section 401(a). The state statute, Arkansas Code Sections 24-7-201 *et. seq.*, containing the benefit provisions for the plan, is supplemented by ATRS Rules and Regulations. As reflected in its certification, filed herewith (*see* Exhibit A), ATRS purchased Gartner common stock during the Class Period and suffered damages as a result of Defendants' fraud.

25. Additional Plaintiff New England Teamsters was established in 1958 to provide retirement income to eligible participants and their beneficiaries. New England Teamsters manages approximately $7.7 billion in assets for its members and beneficiaries. The Fund is jointly administered by an eight-member Board of Trustees—four Trustees representing the Local Unions and four Trustees representing the Contributing Employers. All claims are processed at the Fund Office, which is located in Burlington, MA. The Fund is qualified under Internal Revenue Code ("IRC") Section 401(a), and acts as a multi-employer, defined benefit plan within the meaning of IRC Sections 414(f) and (j). As reflected in its certification, filed herewith (*see* Exhibit B), New England Teamsters purchased Gartner common stock during the Class Period and suffered damages as a result of Defendants' fraud.

**B. Defendants**

26. Defendant Gartner is a Delaware corporation with its principal executive offices located at 56 Top Gallant Road, Stamford, CT 06902. During the Class Period, the Company's common stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "IT."

27. Defendant Eugene A. Hall ("Hall") has served as Gartner's Chief Executive Officer ("CEO") since August 2004, and as its Chairman of the Board of Directors since July 2024. In his role as CEO, Defendant Hall oversaw the Company's corporate growth strategy and shareholder value creation. As Gartner's CEO, Defendant Hall signed each of the Company's annual and quarterly SEC filings, and participated in each of the earnings calls and conferences with securities

analysts during the Class Period, in which he made false and misleading statements and omissions of material fact relating to Gartner's CV growth, the demand for Gartner's Research segment, and the extent to which Gartner's business was impacted by the availability of cheaper AI alternatives. During the Class Period, without adopting a 10b5-1 trading plan, Defendant Hall sold 108,573 shares of Gartner common stock and received $56,021,818 in proceeds.

28. Defendant Craig W. Safian ("Safian") has served as Gartner's Chief Financial Officer ("CFO") since June 2014 and as its Executive Vice President since August 2017. In more than 23 years at Gartner (joining in 2002), Defendant Safian has served as Group Vice President, Global Finance and Strategy & Corporate Development, Group Vice President, Strategy and Managing Vice President, Financial Planning and Analysis. As Gartner's CFO, Defendant Safian signed each of the Company's annual and quarterly SEC filings, and participated in each of the earnings calls and conferences with securities analysts during the Class Period, during which he made false and misleading statements and omissions of material fact relating to Gartner's CV growth, the demand for Gartner's Research segment, and the extent to which Gartner's business was impacted by the availability of cheaper AI alternatives. During the Class Period, without adopting a 10b5-1 trading plan, Defendant Safian sold 25,046 shares of Gartner common stock and received $12,372,516 in proceeds.

29. Defendants Hall and Safian are collectively referred to as the "Individual Defendants" and, together with Gartner, as the "Defendants." The Individual Defendants directly participated in the management of Gartner's operations, including its accounting and reporting functions, had the ability to and did control Gartner's financial reporting, and were privy to confidential information concerning Gartner and its business, operations, and financial statements, as alleged herein. They were also involved in drafting, reviewing, publishing, and/or disseminating

the false and misleading financial statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued, and approved or ratified these misstatements in violation of the federal securities laws.

### C. Relevant Non-Parties: Former Gartner Employees[1]

30. FE-1 worked at Gartner from 2016 until his retirement in June 2025. Most recently, he served as the Vice President and Executive Partner of Gartner's Healthcare practice from November 2016 to June 2025. In that role, he worked with large enterprise clients, primarily health systems and major payors with net patient revenue of $8-10 billion and above. As a Vice President and Executive Partner, FE-1 partnered directly with C-suite executives at major healthcare organizations and contextualized Gartner research for senior healthcare executives, helping those clients apply that research in real-world strategic decision-making. FE-1 explained that he had visibility into Gartner's key performance numbers through his occasional participation in sales meetings, as well as through quarterly meetings with delivery management where high-level projections regarding revenue were presented and discussed. The monthly meetings were led by the Regional Vice Presidents, who would then present the projections to the Group Vice Presidents.

31. FE-2 worked at Gartner from March 2023 until November 2025, serving as a Senior Account Executive for Large Enterprise[2] clients in the High-Tech division. FE-2's High-Tech Division was one of two divisions under Global Technology Sales ("GTS"), along with the "end-user division." The high-tech division serves technology customers, mainly producers and sellers of software, hardware and technology services, while the end-user division works with and advises any company that is seeking to buy technology products or services from those technology

[1] All FEs are described in male pronouns to protect their identities.
[2] Gartner defines "large enterprise" clients as those with $250 million or more in annual run rate, although FE-2 noted that several of his clients fell below that revenue threshold.

vendors. In his role, FE-2 managed accounts for large technology vendors, including providers of customer-relationship-management (CRM), enterprise-resource-planning (ERP), and marketing technology products. FE-2 estimated that his division represented approximately 15-20% of Gartner's total revenue. FE-2 explained that his responsibilities gave him direct, contemporaneous knowledge of sales and contract performance, negotiations, and renewals, as well as feedback from customers, for accounts managed in his division, as well as across the Company. FE-2 explained that throughout his tenure at the Company, there were widespread and consistent customer concerns in the high-tech division, not isolated to particular accounts or geographies, regarding Gartner's capabilities.

32. FE-3 was employed in a variety of roles by Gartner from approximately June 2018 through July 2025, starting as an intern. His final position was Account Executive, Large Enterprise. He explained that his role was essentially a sales position in which he was responsible for retention and growth for clients in the Large Enterprise sector, which included clients with annual revenues from $1 billion up to $10 to $15 billion. He explained that he sold subscription advisory services to clients, in which the subscriptions gave customers access to Gartner's portal, through which they could access Gartner's products and information behind the Company's paywall. FE-3 explained that information he heard about customers reducing spend or not renewing their contracts was reported up to senior management through forecast calls with managers, who in turn reported this information to the VPs, who then reported it up to the MVPs (Managing Vice Presidents).

33. FE-4 was formerly employed by Gartner as Sales Manager from before the Class Period to the second half of 2025. According to FE-4, his responsibilities as Sales Manager included leading a number of team members in selling Gartner's products to customers.

34. FE-5 stated that he joined Gartner in November 2022 and remained with the Company until August 2025. During that period, he worked as an Account Executive and later as a Senior Account Executive within Gartner's Global Technology Sales ("GTS") Mid-Sized Enterprise ("MSE") organization. FE-5 explained that he managed between nine to eleven accounts within the MSE "Micro" segment. His clients were technology vendors, generally at the smaller end of Gartner's mid-sized enterprise customer base, often consisting of companies with approximately 10 to 50 employees and roughly $10 million to $50 million in annual revenue, although the broader segment could include somewhat larger companies. His responsibility was to maintain existing Gartner relationships, ensure customers continued renewing their contracts, and increase contract value where possible by expanding Gartner services within those accounts. According to FE-5, sales personnel received performance updates through those dashboards, which were reviewed during team meetings and regional meetings. Metrics such as quota attainment, contract value performance, and other KPI data were delivered via those dashboards.

35. FE-6 worked for Gartner from before the Class Period through January 2026, most recently as an Account Executive on the legal-focused assurance team. In that role, FE-6 managed existing client relationships and contract renewals, and identified opportunities to grow accounts through upselling Gartner's services. His client base consisted of dozens of midsized companies, generally ranging from $400 to $700 million in revenue, with a small number with revenue exceeding $1 billion. FE-6 reported to the Director of Assurance, who in turn reported to Vice President Shane Bailey, a senior leader overseeing assurance and finance functions. Through conversations with colleagues—particularly those on the large enterprise team—FE-6 learned that those groups were experiencing increased pressure, difficulty winning new business, and instances of lost clients. FE-6 described this information as circulating informally through "chatter" across

divisions, which served as a key source of insight given the limited transparency in formal company communications.

36. FE-7 was formerly employed by Gartner as an Account Executive from December 2023 to December 2025. He was part of Gartner's Start-up division that managed and sold Gartner's insights product to start-up companies in the New England and Mid-Atlantic regions. According to FE-7, that division was comprised of a group of six to eight Account Executives, including himself.

37. FE-8 was formerly employed by Gartner, Inc., most recently as a Senior Sales Manager from First Quarter 2025 to October 2025. According to FE-8, his responsibilities as Senior Sales Manager included leading a team that sold Gartner's products to clients in the Company's Nordic region. As part of his role, he attended "ops meetings," or operations meetings, held at the beginning of each quarter to review why contracts were not renewed.

38. FE-9 was employed at Gartner from May 2022 until July 2025, serving as a business development manager in Global Technology Sales for the mid-sized enterprise segment. His responsibilities included identifying technology service providers and technology companies with less than $250 million in revenue, securing meetings with decision-makers, identifying pain points, and persuading prospective customers of Gartner's value proposition.

39. FE-10 was employed at Gartner from 2007 until January 2025, where he worked in both the Consulting and Research & Advisory sides of the business. He first spent a decade as Vice President, Consulting, before transferring to the Research & Advisory arm of the business. Most recently, FE-10 served as a Vice President, Analyst in the CIO research arm from 2017 to January 2025. FE-10's immediate manager was a Managing Vice President, who in turn reported up to Group Vice President Barbara Gomolski, who led the CIO research group, and then through

Val Sribar, who headed Research & Advisory and reported to Defendant Hall. FE-10 explained that he worked closely with Gartner's sales organization because analyst expertise could directly affect contract renewals and expansions. FE-10 explained that, when contracts were at risk of non-renewal, his team would set up so-called "war rooms" to brainstorm workshops or presentations they could provide the client as a demonstration of Gartner's value.

40. FE-11 was employed at Gartner from early 2023 until the second half of 2025 as a Managing Partner within the Consulting business. He both sold and delivered consulting services for clients in the manufacturing, consumer goods, retail, and utilities ("MCRU") segment. FE-11 explained that although the MCRU practice within Gartner Consulting is relatively small, he participated in practice-level leadership discussions and therefore had visibility into business and operating challenges affecting the group. George Miller, the leader of the MCRU practice, was FE-11's manager.

41. FE-12 stated that he worked at Gartner from July 2022 until March 2025. During that time, he served as an Enterprise Account Executive in the Research segment within financial institutions division, covering large enterprise financial institutions throughout the United States and Latin America, including major banks and a multi-billion-dollar financial institution in the United States.

42. FE-13 worked at Gartner for several years prior to the Class Period until January 2026. During the Class Period, he worked in a management role in a business unit that reported up to Scott Hensel, Executive Vice President of Global Services and Delivery. As a senior leader, FE-13 routinely attended quarterly leadership presentations and readouts involving Global Services and Delivery ("GSD"), and frequently helped prepare materials that were ultimately presented to senior leadership, including the Operating Committee, which included Defendants Hall and Safian.

## IV. SUBSTANTIVE ALLEGATIONS OF FRAUD

### A. Background

#### 1. Overview of Gartner's Business

43. Founded in 1979, Gartner is a research and advisory firm. The Company delivers proprietary business and technology insights, research, and analyses to help its clients make smarter decisions and drive better performance on their "mission-critical priorities." Gartner's clients are comprised of C-level executives and their teams in every major function, including technology, human resources, supply chain, finance, marketing, and legal.

44. Gartner operates through three principal business segments: (i) Research,[3] (ii) Conferences, and (iii) Consulting.

45. The Research segment produces research, data, and expert analysis for enterprises across several practice areas. The Conferences segment provides IT and business executives with opportunities to learn, share, and network while navigating disruption, managing risks, and prioritizing investments. The Consulting segment provides IT cost optimization, digital transformation, and IT sourcing optimization services to enterprise executives through Gartner's consultants.

[3] On August 5, 2025, during the Q2 2025 earnings call, Defendant Safian announced that Gartner was renaming the "Research" segment to "Business and Technology Insights," or simply "Insights," in order to "reflect the nature of the value [the Company] provide[s] to clients." For the sake of consistency, the segment will be referred to herein as "Research."




Gartner at William Blair's 46th Annual Growth Stock Conference, June 2, 2026.

**2. Gartner's Most Critical Business Segment: Research**

46. The Research segment, according to Gartner's Annual Reports, is the Company's "largest and most profitable segment" and generates the vast majority of the Company's revenue. For example, in 2024 and 2025, the Research business was responsible for approximately 77% and 78% of Gartner's total revenue, respectively.

47. Within the Research segment, there are two separate business units: (i) Global Technology Sales ("GTS"), which provides research and expertise to information technology professionals, and (ii) Global Business Sales ("GBS"), which serves other functional leaders such as human resources, supply chain, finance, and marketing. The GTS unit typically accounts for approximately 75% of the Research segment's CV, while GBS makes up the remaining 25% of the Research segment's CV.

48. The Research segment almost exclusively generates revenue from subscription contracts with a minimum twelve-month period, and, traditionally, roughly 75% of the

subscription contracts are multi-year contracts. Though Gartner bills its contracts up-front, the Company recognizes the Research segment's subscription revenues ratably over the applicable contract term.

49. The subscription contracts are priced for three different tiers. According to analyst reports from RBC Capital Market Research and Morgan Stanley Research, the Reference product (entry tier) provides read-only access to all research insights with an annual price of approximately $20,000 per license; the Advisory product (middle tier) builds upon the Reference product by adding unlimited access to speak with Gartner analysts, with annual pricing ranging from approximately $45,000 to $50,000 per license; and the Guided product (premium tier) expands on the Advisory product by offering access to an executive partner who provides day-to-day advisory services, with annual pricing ranging from approximately $80,000 to $150,000.[4]

50. Under the subscription contracts, Gartner's clients gain access to research insights through services that include on-demand access to Gartner's published research content, data, and benchmarks, as well as direct access to a global network of research experts.

51. For instance, the Research segment provides actionable business and technology insights and trends for various functions within an enterprise—including Communications, Customer Service and Support, Finance, Human Resources, Information Technology, Legal, Risk and Compliance, Marketing, Product Management, Research & Development, Sales, and Supply Chain. For each of these functions, Gartner provides insights and research on emerging trends and topics.

[4] The subscription contracts are designed to give research and advisory access to "individual users" (i.e., licensed seats) over the defined term period. As such, "seat expansion," or increasing the number of individual licensed users at a given client company, was a primary means of growing Gartner's existing business.

52. Likewise, when evaluating different vendors for a software platform, clients may rely on Gartner's Magic Quadrant, which provides a visual summary of how different software vendors are compared to each other, in terms of quality, growth, innovation, and features.




53. As such, through its Research segment, Gartner purportedly garnered a substantial competitive moat on its proprietary research that competitors cannot readily replicate because much of Gartner's research insights derive from data unavailable to the general public.

**3. Gartner's Most Important Financial Metric: Contract Value (CV)**

54. Gartner uses several key financial metrics to measure the financial performance of its Research segment, including Contract Value or CV, client retention, and wallet retention.

55. CV is the Company's "single most important performance metric," according to Gartner. It is defined as the "annualized dollar value of all subscription-related contracts in effect at a specific point in time, without regard to duration." It is not the total dollar amount of all

customer contracts or revenue recognized during a reporting period. In effect, it represents a point-in-time snapshot of annual recurring revenue.[5]

56. Comparing CV year-over-year, Gartner says, "not only measures the short-term growth" of its business, but also "signals" the "long-term health" of its Research subscription business because it measures revenue that is "highly likely to recur over a multi-year period." Indeed, Gartner publicly told investors that "CV is predictive of revenue highly likely to recur over a 3 to 5 year period, and a high CV growth rate translates to high, long-term revenue and profit growth."

57. However, the reliability of CV as an indicator of future revenue depends on Gartner's ability to retain clients that renew multi-year contracts. If renewal rates start slipping, CV still counts contracts that are about to expire and may not be renewed, making the business look healthier than it actually is.

58. Investors understood that CV was the closest proxy for measuring and modeling the Company's growth prospects and paid close attention to it. For instance, in a November 5, 2024 report, Morgan Stanley Research emphasized that "Research CV remains the key metric for investors as it is a forward-looking indicator for growth."

59. Finally, Gartner reports two additional metrics, client retention rate and wallet retention rate, that demonstrate the current health of the Company's expected recurring revenue. "Client retention rate" tracks the number of clients that return (i.e., how many clients remained as clients from the prior year), and "wallet retention rate" tracks the dollar value of renewed contracts

[5] To illustrate, if a customer enters into a three-year contract with a total value of $360,000, the customer would pay Gartner the entire $360,000 upfront. For each quarter, Gartner would recognize $30,000 of that amount as revenue. In contrast, that contract would contribute $120,000 to Gartner's total CV for each quarter that the contract remains in effect.

(i.e., the dollar value of a client's previous year's contract compared to that of the next contract). Notably, wallet retention above 100% means that the dollar value of business from retained clients actually grew year-over-year, and when wallet retention exceeds client retention, it indicates retention of higher-spending clients, increased spending by retained clients, or both. On the other hand, when wallet retention falls below 100%, that means the dollar value of business from retained clients decreased—i.e., existing customers spent less on Gartner's services.

### B. Before the Class Period, Defendants Repeatedly Denied that Generative AI Would Disrupt Gartner's Research Business

60. In late 2022, OpenAI released ChatGPT, a generative AI chatbot, built on large language models (LLMs) and quickly reached 100 million users in two months after its release. Then, in March 2023, Anthropic released its competing generative AI tool, Claude. As these generative AI tools became increasingly popular, and billions in investments poured into the sector, LLMs' accuracy and capabilities also grew exponentially.

61. Throughout 2023, OpenAI, Anthropic, and other companies developed increasingly improved generative AI tools that could rapidly summarize vast amounts of information and generate thoughtful answers in response to user queries. For example, a user may ask ChatGPT or Claude to compare different software vendors, and in seconds, the chatbot will generate a list of vendors, summarizing and weighing their pros and cons. A user then may ask follow-ups to narrow the list until the user is comfortable with selecting a vendor. These generative AI tools' capabilities could, thus, compete with the purported core value proposition of Gartner's Research services, which similarly synthesize complex market data and industry trends to provide insights to enterprise clients.

62. Moreover, unlike Gartner's research and insights, the answers from generative AI tools are not kept behind a $20,000 (or more) paywall. Rather, users may access Claude or

ChatGPT either for free or a minimum of $20 per month. In addition, as more and more companies and corporations invested in AI tools and made them available to all their employees, those companies were faced with the decision of utilizing an AI tool or continuing to spend additional tens of thousands of dollars on a separate research platform such as Gartner.

63. Given the looming competitive threats from generative AI, analysts have repeatedly asked Gartner questions about how these new AI products might impact Gartner's business. In response, Defendants denied that AI would negatively impact its business or CV growth, claiming instead that Gartner would actually benefit from the rise of AI, which would drive demand for the Company's Research segment.

64. For instance, during the June 6, 2023 Baird Global Consumer, Technology & Services Conference, an analyst asked: "[I]nstead of asking a Gartner analyst or instead of searching gartner.com for content, what if I can use an AI tool and query – and curate information that's publicly available? And is that a barrier to somebody signing on as a Gartner client?"

65. Defendant Safian responded: "[W]e don't think so at all . . . we continue to be focused on making sure that we are creating insights and data and tools and information and assets that help our clients with their mission critical priorities and making sure it's significantly differentiated from what you can get through ChatGPT or a tool like that."

66. Similarly, during an August 1, 2023 earnings call, Defendant Hall stressed that Gartner's clients turned to them for their AI needs: "We're seeing a lot of demand with enterprises that we hadn't seen before where they're saying, hey, could you please come in and talk to us about AI? So we expect that that will be a positive for our business." He later also pointed to "a tremendous amount of client demand" and emphasized that Gartner is "the best source for clients to get help in AI."

67. After all, Gartner's whole business provided the IT and business world with cutting-edge information on the competitive landscape in the marketplace. They were in pole position to know what the impact of AI would be on all sorts of businesses including their own. For that reason, investors took Defendants at their word when they were told that AI was not negatively impacting Gartner's CV.

68. At the same time, Gartner was experiencing a downturn in CV growth, which fell into single digits in the first quarter of 2023 and continued to decline through the rest of the year. Throughout 2023, and in early 2024, Defendants attributed that decline to macroeconomic conditions, not AI. For example, on April 30, 2024, after reporting the first quarter of 2024's CV growth was just 6.9%, Defendants explained that "[t]he world continues to experience broad geopolitical and economic uncertainty," and that "our clients experienced more challenging macroeconomic conditions which led to a tougher selling environment."

69. Coupled with Defendants' insistence that AI was a benefit, and not a threat, to Gartner's business, analysts and investors were assured that the Company would return to double-digit CV growth and thus long-term revenue growth. For example, on April 30, 2024, Barclays reported that the Company's "return to DD (double digit) growth pushed out, but should be intact over time," adding that investors' FY2025 view of 11-12% CV growth remained unchanged. Similarly, on May 11, 2024, Baptista Research cited increased demand from AI-related inquiries, remarking: "Artificial Intelligence (AI) across departments and roles has become a key subject matter of interest . . . [Gartner] do expect it to be a net positive in the margin over time."

### C. Defendants Misled Investors About CV Growth and the Competitive Threat Posed by Generative AI

70. The Class Period begins on July 30, 2024, when Gartner announced financial results for the second quarter of 2024. During the earnings call held on the same day, Defendants

emphasized that the Company's CV growth would rebound after a rocky year in 2023. Specifically, Defendant Safian announced that the first quarter of 2024's CV growth of 6.9% ***"marked the bottom for CV growth . . . .***" and that "barring a meaningful shift in the macro or geopolitical environment," Gartner's CV growth "***should be above that in every quarter moving forward***."

71. Defendant Safian's statements led investors to believe that, with 2023's macroeconomic headwinds behind them, Defendants had observed strong demand signals and renewals from current customers necessary to support Defendant Safian's statement about further CV growth and the lack of any additional headwinds. But in truth, Gartner was facing a threat to its business caused by the rapid rise of AI—a fact known by Defendants at the time—that meant Gartner had not experienced the "bottom" of its growth story. By that point, and unbeknownst to investors, the availability of cheaper alternatives from AI had resulted in widespread cancellations, reductions in seats and spending, and decreased demand.

72. For example, FE-5 stated that conditions at Gartner throughout 2024 were "appalling" due in part to the emergence of cheap AI as a competitive threat. According to FE-5, a major factor affecting customer behavior was the emergence of artificial intelligence and large language models. Beginning in 2024, many of his customers openly questioned Gartner's long-term value proposition. FE-5 recalled numerous conversations in which clients asked, in substance, how Gartner's analyst services would continue to be necessary if AI tools could provide similar information and research. FE-5 stated that these concerns were widespread among his customer base, and represented a significant shift from prior years.

73. Nevertheless, a few months later, on November 5, 2024, Defendants continued to tout CV growth and assure investors that they had not observed any reduced spending from

customers. During the earnings call for the third quarter of 2024 held that day, Defendant Safian touted, "CV grew high single digits in the quarter, and ***we believe the first quarter of 2024 was the bottom for CV growth in this cycle***." Then, when an analyst asked about client spending in the third quarter and going into the fourth quarter, Defendant Safian responded: "Again, ***I wouldn't say we saw anything different from a client spending or an end market perspective*** . . . . So, ***I think there's no big change from a client spending perspective or any external trend like that, more of the same***."

74. However, these statements were false and misleading because Defendants had already observed a fundamental change in consumer spending caused by cheaper AI alternatives—which directly contradicted Defendants' false claim that the first quarter of 2024's CV growth of 6.9% was the bottom. As detailed below, FE accounts demonstrate that by at least mid-2024, and worsening throughout the end of the year and into 2025, Defendants saw negative demand trends caused by AI that contradicted their public reassurances that the Company's CV growth was supported by ample demand.

### 1. Former Gartner Employees Demonstrate Gartner Experienced Reduced Demand, Attrition, and Lower Spending Throughout 2024

75. FE accounts demonstrate that by at least July 2024, and worsening throughout the end of 2024 and into 2025, Gartner's Research segment experienced widespread internal problems stemming from the availability of cheaper generative AI tools. Indeed, FE-4 explained that Gartner's CVs were declining throughout the Class Period, if not sooner, and that AI was the reason why CVs were declining.

76. Specifically, Gartner's clients from across all segments, including the important GTS segment—which includes IT professionals and accounts for roughly 75% of the Research segment's business—were leaving or reducing their spending during that time.

77. For example, according to FE-3, who was employed as an Account Executive, Large Enterprise, the Company began seeing the trend of customers reducing their spend or not renewing contracts in mid-2024, but the trend really hit in 2025. FE-3's role was essentially a sales position in which he was responsible for retention and growth for clients in the Large Enterprise sector, which included clients with annual revenues from $1 billion up to $10 to $15 billion. FE-3 elaborated that AI was "coming down the pike" and many customers realized that they were paying Gartner for what AI could do at much lower cost. As a result, he continued, customers were cutting their contracts "left and right." He recalled that customers were telling him and his colleagues that they could do most of what Gartner was providing using ChatGPT or other AI products.

78. FE-3 added that he worked in the Commercial Sector and some of his customers included Experian and Costco's Latin American operations. FE-3 added that he heard every other week that customers were reducing their spend or not renewing their contracts. He indicated that this information was reported up to senior management through forecast calls with managers, who in turn reported this information to the VPs, who then reported it up to the MVPs (Managing Vice Presidents).

79. Additionally, FE-1, who was the Vice President and Executive Partner of Gartner's Healthcare practice from November 2016 to June 2025, explained that, while Gartner once held a unique position as a differentiated, premium research provider, in 2024 this differentiation began to evaporate in large part due to the rapid emergence of artificial intelligence tools. FE-1 explained that throughout 2024, clients were increasingly questioning why they should pay what he characterized as exorbitant fees for Gartner research when similar insights could be obtained through much less expensive or even free AI-driven tools. FE-1 repeatedly stated that "AI has changed the world," and that Gartner reacted far too slowly to this reality. FE-1 stated that Gartner

was not able to articulate effectively its value proposition in response to AI, which made it a "tough sell" for a large number of potential contract renewals.

80. Throughout 2024, FE-1 recounted that he observed noticeable deterioration in performance metrics among a number of his colleagues. FE-1 estimated that colleagues' retention rates were often below 80 percent. He noted that this was especially true for executive partners who were handling smaller, less established accounts, where clients were more likely to question whether Gartner remained a worthwhile expense in light of AI and broader market pressures.

81. Likewise, according to FE-12, who was an Enterprise Account Executive, covering large enterprise financial institutions, customers increasingly refused to renew their licenses because they no longer perceived value in Gartner's products, and frequently expressed the view that they could obtain similar information elsewhere at substantially lower cost. FE-12 estimated that he began hearing these concerns consistently by the end of the first quarter of 2023. According to FE-12, customer dissatisfaction became so widespread that banking clients were "dropping like flies." Conditions continued deteriorating throughout late 2024 and into 2025. He described late 2024 and early 2025 as the worst period he observed during his tenure. Because Gartner tracked renewal opportunities six to nine months in advance and management regularly reviewed those forecasts, FE-12 stated that supervisors and leaders above them already knew well ahead of time that renewal rates were deteriorating and that significant portions of the division's customer base were unlikely to renew. Particularly, according to FE-12, by the end of the third quarter of 2024, many of his banking accounts had projected renewal rates of only approximately 20% to 30% six to nine months before their contracts' expiration.

82. FE-7, an Account Executive from December 2023 to December 2025 in Gartner's Start-Ups division, explained that there was regular turnover in his region throughout 2024. FE-7

recalled that there were two to three teams in his region, for a total of 25 sales representatives, that had a "gap" in retention goals in 2024—meaning they missed their retention goals—and the gaps became more apparent in 2025.

83. Furthermore, according to FE-7, when his tenure first began in December 2023, he was informed that his growth goal in 2024 was for $120,000, but that was halved in 2024. He explained that everyone in his broader 25-person region was dropped from a 6-figure goal to a range of $45,000 to $50,000 each. According to FE-7, in hindsight, the halving of his team's growth goals in 2024 was an acknowledgement by the higher-ups that CV growth was going to be challenging going forward. FE-7 advised that his sales manager would not have had the level of authority to unilaterally reduce growth goals, and FE-7 suggested it must have come from Regional Vice President Alicia Larkin and the SVP of his region, and signed off by the "leadership level."

84. During that same time, clients became increasingly frustrated with the quality of Gartner's research and quickly turned to cheaper AI tools when they realized that they could obtain similar, or sometimes better, research at a fraction of the cost.

85. For instance, FE-2, who was a Senior Account Executive for Large Enterprise clients in the High-Tech division, observed a meaningful decline over time in both the level and quality of Gartner's research capabilities. FE-2 explained that this trend emerged from the moment he joined the company in March 2023, became more prevalent in 2024, and became pervasive in 2025. FE-2 recounted that, in early 2024, he began to hear customers compare the quality of analysis they could get from Gartner to public AI tools; by 2025, he was hearing it from customers "all the time."

86. Moreover, by early 2024 and increasingly throughout that year and 2025, FE-2 said, customers increasingly told FE-2 that they could obtain similar or nearly identical information by

using tools such as Microsoft Copilot or ChatGPT, without paying $100,000 or more per individual Gartner license. FE-2 stated that customers questioned why they should continue paying those prices when AI tools were producing answers that were "very close" to what they historically received from Gartner.

87. In addition to reports from customers, FE-2 explained that the impact of this decline was clearly reflected in internal data for sales and contract renewals. FE-2 observed customers reduce annual contract values from approximately $500,000 to approximately $100,000, while others declined to renew at all. According to FE-2, similar reductions and non-renewals occurred across accounts and regions as customers questioned Gartner's value, pricing, and contract terms. FE-2 stated that colleagues on his team and adjacent teams lost contracts well in excess of $1 million under similar circumstances.

88. According to FE-7, he and his colleagues similarly experienced decreasing CV through 2025 that was mostly due to their customers utilizing AI, which provided similar insights and research for free rather than contracting with Gartner. FE-7 elaborated that Gartner's high pricing was the main driver of the decreasing CV, with AI being a "big factor" because it could do much of what Gartner's services provided for his high-tech clients at a "minimal price."

89. Additionally, FE-10, who was a Vice President, Analyst in the CIO research arm from 2017 to January 2025, stated that, beginning in the fourth quarter of 2024, clients were increasingly questioning the value of expensive Gartner subscriptions when low-cost AI tools were becoming available. He described hearing versions of the same concern repeatedly: why pay tens of thousands of dollars annually when AI products cost only nominal monthly fees.

90. Specifically, FE-10 said many research analysts understood that AI would materially change the Company and discussed that among themselves and with management. The

issue was raised in multiple town halls late in 2024 because employees were simultaneously being told to produce AI-related research while lacking clarity on Gartner's own internal response. FE-10 identified at least five other employees at the Vice President or Distinguished Vice President level within Gartner's Research & Advisory business who publicly expressed concerns about the potential impact of AI on Gartner's business model. FE-10 specifically remembered that, during an internal conference call held in the fall of 2024, one colleague responsible for monitoring technology trends openly questioned whether AI was going to "put us out of business." According to FE-10, that call was attended by at least two supervisors at the Managing Vice President level.

91. The availability of cheaper AI alternatives also caused decreased demand in Gartner's other segments. For example, within the MCRU practice in the Consulting segment, FE-11 stated that he began observing headwinds and slowing growth during early 2024. FE-11 stated that MCRU stopped growing and began decelerating significantly. He attributed much of the consulting slowdown to the emergence of artificial intelligence. According to FE-11, clients increasingly viewed AI tools as alternative sources of insight and information that Gartner had historically provided through research subscriptions and consulting engagements. FE-11 explained that Gartner's traditional value proposition became less compelling as customers believed they could obtain similar information from AI without paying Gartner's fees. FE-11 stated that this dynamic significantly affected demand for Gartner's services.

**2. Defendants Closely Tracked Reduced Demand and Retention Problems**

92. Defendants admitted throughout the Class Period that they closely tracked and monitored client retention. For example, later in the Class Period (during the Company's August 5, 2025 earnings call), Defendant Hall reminded investors that the Company "track[s] the number of days from when the deal enters the pipeline to the number of days it closed" and that "a lot of

deals" were being "escalated from the functional leader like a CIO or a CHRO up to the CFO or CEO." Similarly, on the Company's November 4, 2025 earnings call, Defendant Hall again admitted that "we track, as I talked about in the past, in our system, we actually ask our salespeople to track it. We have follow-up calls with them. We have a lot of interactions. And basically, in terms of when a client actually says, hey, I'm thinking about using Gartner versus literally AI."

93. Former employees similarly confirmed that Defendants closely monitored and tracked the decreased demand and contract cancellations, which contradicted their public statements to the market, through various means, including centralized internal systems, reports, and quarterly sales meetings. *See* Section VII.B, *infra*.

94. FE-13 explained that Gartner maintained extensive retention analytics that were reported up the chain of command at the quarterly meetings hosted by Hensel and attended by the Operating Committee. Specifically, Gartner maintained monthly dashboards, including one referred to as the Operating Committee Dashboard, which tracked retention performance at multiple levels, including products, geographies, teams, and leadership structures. According to FE-13, this dashboard—as well as PowerPoint slides which were direct outputs of the dashboard—were regularly available to senior leadership and the Operating Committee, including Defendants Hall and Safian. FE-13 described both Defendants Hall and Safian as highly detail-oriented executives who had direct access to these materials. Another of many sources of retention analytics was the "Product Finance dashboard," which was created by the finance team. According to FE-13, the operations functions regularly used this dashboard for retention and growth analytics. FE-13 knew that retention became a "huge challenge" throughout much of Gartner's business during the Class Period from his review of these Operating Committee dashboards. During quarterly

meetings that he attended during the Class Period, both Hall and Safian acknowledged these retention challenges and the difficult business environment.

95. Similarly, FE-2 personally used, had access to, and viewed the data tracked in Salesforce. FE-2 confirmed that his observations about Gartner's declining performance were reflected in data reported to Gartner leadership through internal systems. Gartner tracked contract values, renewals, pipeline status, and sales forecasts in Salesforce, which were accessible to and used by all Gartner senior management. FE-2 also personally reviewed separate forecasting spreadsheets that were prepared for higher-level management.

96. Further, according to FE-2, Gartner also tracked reasons why clients declined to renew contracts. In addition to using Salesforce and explaining cancellations to supervisors via email or Teams messages, account executives were regularly required to prepare PowerPoint presentations for their quarterly business reviews, called "QBR decks." If an account executive believed that the contract was at risk due to the competition from AI, it would likely be noted in these QBR decks. FE-2 emphasized that renewals were a critical focus of the QBRs and a key metric by which account executive performance was assessed.

97. FE-12 stated that this information was documented within Gartner's Salesforce CRM system, which automatically captured emails, Zoom meeting notes, and other customer interactions, and that Account Executives also manually recorded reasons customers provided for non-renewal. Based on these reporting processes, FE-12 stated that management had access to detailed information regarding customer dissatisfaction, declining renewal probabilities, and expected customer losses well before contracts expired.

98. Additionally, according to FE-5, performance tracking and reporting were conducted through Microsoft Power BI dashboards. Sales personnel received performance updates

through those dashboards, which were reviewed during team meetings and regional meetings. Metrics such as quota attainment, contract value performance, and other KPI data were delivered via those dashboards. FE-5 understood that the EVP of Sales and the Chief Revenue Officer used Power BI reporting to monitor performance across the MSE organization by senior executives.

99. Likewise, FE-4 said that Gartner's senior level executives, including the C-suite, were well aware of the declining CVs. Specifically, he explained that, together with senior level executives, he attended Growth and Retention Team meetings, which occurred on Teams, and that the purpose of the Growth and Retention Team meetings was to discuss and strategize as to how to retain contracts. The Growth and Retention meetings were held via Teams video calls and attended by executives and senior leadership from various departments within Gartner, including but not limited to, sales, delivery and the "Growth and Retention Team."[6] FE-4 explained that he created a "deck" in preparation for each of these meetings and in which he had to present to this group on what the feedback from the client was and the group would then discuss what could be offered to get the multi-year contract renewed. FE-4 added that the Growth and Retention Team then separately reported a summary to the CEO and "Executive Team" on their findings on data in growth and retention.

100. According to FE-4, the Growth and Retention team looked at all the contracts coming up for renewal and allocated Growth and Retention resources and prioritized contracts that are due for renewal in that calendar year. He added that Growth and Retention "aligned with" the account team who were responsible for these contracts around 6 - 9 months before the contract came up for renewal and sometimes even 12 months before.

---

[6] FE-4 advised that each channel – mid-size, large, and global enterprise – had their own Growth and Retention team meetings.

101. FE-4 advised that, following the meeting, notes taken by the Growth and Retention team during the Teams meetings were then used to update the C-suite. FE-4 added that he had been told in some of these meetings that the information provided was going to be reported to CEO Eugene Hall.

102. FE-13 also explained that Gartner maintained a separate forecasting process. Sales forecasts were rolled up through finance and, in his understanding, presented to both Defendants Safian and Hall. In addition to tracking performance metrics and forecasting, Gartner monitored and tracked client feedback and retention through the Global Retention Programs team (also known within the Company as the "Growth and Retention" team), which identified retention risks and potential threats to client renewals. A particularly important component of the Global Retention Program's work was its "Voice of the Customer" efforts, a dedicated function that focused on the systematic collection and analysis of customer feedback.

103. The Company also utilized "win rooms" that were stood up to address individual at-risk contracts. By 2024, the renewal problems and reduced spending among clients were so significant that Defendants utilized these "win rooms" to strategize on how to retain clients and maintain CV growth.

104. For example, FE-1 stated that Gartner increasingly used a "win room" throughout 2024 after the Company became increasingly concerned about client attrition. According to FE-1, the win room consisted of meetings involving sales leadership, account executive leadership, and their respective teams to discuss clients that were at risk of terminating or reducing their relationship with Gartner. FE-1 explained that participants would review specific accounts, develop retention strategies, and discuss what could be done to persuade clients to remain with the Company.

105. FE-1 stated that the participants would prepare presentation materials and conduct meetings, often using large display screens, to engage in detailed discussions regarding clients at risk of being lost. According to FE-1, these discussions were focused on identifying ways to change a client's decision and preserve the business relationship. FE-1 further stated that Gartner Managing Vice President John Rogers would participate in these meetings when there was a risk of losing a significant client, or "large logo." FE-1's estimate was that 85% of the time the client would cancel anyway. He further added that the win room was created because, at that time, Gartner could not afford to lose any clients. He referred to win rooms as an effort at "CYA."

106. Critically, Defendants knew about the possibility of contract cancellations months before the contract expired. Because renewals were typically initiated six months before the renewal date, contract cancellations or reduced spending during the renewal period were strong indicators that CV growth could not be sustained and growth decline was inevitable. For instance, FE-8 advised that he and other sales personnel started talking to clients about renewing their contracts 9 months before the renewal date was due. He added that if the client were saying 6 months before the renewal date that they were still deciding whether or not to renew, that this was an indication that they were not likely to renew, or would renew at a lesser contract value.

### D. While Misleading Investors, the Individual Defendants Unloaded Their Gartner Stock

107. Armed with information that (i) Gartner's Research segment was experiencing poor demand due to the availability of cheaper AI alternatives and customer dissatisfaction; and (ii) clients were telling Gartner in 2024 that they either were not renewing their expiring contracts or would renew their contracts at a reduced price, both of which would inevitably lead to a declining CV in 2025, the Individual Defendants unloaded over $65 million of their stock in the final few months of 2024. Specifically, the day after the start of the Class Period, when Defendants falsely

assured the market that 6.9% "***marked the bottom for CV growth***," on July 31, 2024, Defendant Hall sold 39,566 shares at an average price of $502.30 per share, totaling $19,874,163 in proceeds, and Defendant Safian sold 5,306 shares at an average price of $501.19 per shares, totaling $2,659,314 in proceeds.

108. Then, immediately after the November 5, 2024 earnings call, during which Defendants again falsely reassured investors that CV growth had bottomed and that they had not observed any change in customer spending, Defendants Safian and Hall sold another $22 million of Gartner stock. Specifically, as the Company's stock price climbed to successive all-time highs, on November 6, 2024, Hall sold 16,651 shares at an average price of $536.90, totaling $8,939,922 in proceeds, and on November 8, 2024, Defendant Hall unloaded another 18,296 shares at an average price of $546.24 per share, totaling $9,993,925.88 in proceeds, and Defendant Safian sold 2,819 shares at $547.40 per share, totaling $1,543,120.60 in proceeds. The next trading day, on November 11, 2024, Safian sold 3,516 shares at a price of $550.81 per share, totaling $1,936,647.96 in proceeds.

109. In total, in just the first four months of the Class Period, Defendant Hall sold 108,573 shares for $56,021,818 in proceeds, and Defendant Safian sold 17,951 shares for $9,190,410 in proceeds. Neither Defendant Hall nor Defendant Safian had ever sold such a large dollar amount of Gartner stock in any comparable four-month period before the Class Period began. Critically, none of their sales from July to November 2024 were executed under a Rule 10b5-1 trading plan.

110. While Defendants sold millions in stock on inside knowledge of the Research segment's declining demand and mounting cancellations, the market remained in the dark and continued to credit Defendants' assurances. For example, on December 9, 2024, Goldman Sachs

Research commented, "Gartner's Research CV growth has recently bottomed and is reaccelerating as demand for IT best practices research is rising." In fact, Goldman Sachs produced a chart clearly showing that CV growth had bottomed at 6.9% and would continue to accelerate into 2025.




111. Likewise, on January 21, 2025, William Blair Research again referenced Defendants' statement from July 30, 2024, noting: "On the company's third-quarter earnings call, management reiterated its confidence that CV growth reached a bottom in the first quarter (6.9% growth). Management's conviction is supported by strong year-over-year new business growth in both GTS (+8%) and GBS (+10%)." It then concluded: "From there, we anticipate consistent, gradual increases in CV growth on the way back to the low-double-digit to low-teens CV growth rate we expect for the business over the medium term."

**E. Beginning in 2025, as Contract Cancellations and Reduced Spending Worsened, Defendants Offered Price Concessions to Retain Research Clients**

112. As the Class Period progressed, contract cancellations and reductions in spending worsened, as divisions throughout the Research Segment increasingly struggled to retain clients

amid weak demand driven partly by the availability of cheaper generative AI. In an effort to retain customers, Defendants abandoned Gartner's longstanding practice of mandating price increases at renewal and instead offering flat pricing—a change that retained some clients but at the cost of further depressing CV growth.

### 1. The Research Segment Experienced Worsening Demand and Retention Problems

113. Over the course of the Class Period, FE-13 observed increasing emphasis on retention over growth. According to FE-13, although Gartner traditionally emphasized that both growth and retention were important, leadership consistently viewed retention as the more critical metric because Gartner relied on a subscription-based business model. If retention deteriorated, growth alone could not compensate for the resulting losses.

114. Throughout the Class Period, FE-13 observed resources originally allocated to growth initiatives being redirected toward retention-focused efforts. He recalled conversations in which Gartner senior executives explicitly stated that retention had become more important than growth because the Company faced significant renewal challenges due to the growing impact of AI as a competitive alternative. FE-13 explained that these retention concerns extended across both Gartner Technology Sales ("GTS") and Gartner Business Sales ("GBS").

115. Similarly, by the beginning of 2025, FE-1 stated that healthcare was "bleeding like a lot of the rest of the organization." He characterized the progression as clear: strong performance in 2023, mixed and declining performance in 2024, and obvious trouble in 2025, such that "you had to see the writing on the wall." Further, FE-1 explained by at least 2025, Gartner's value proposition had significantly eroded and was materially different from prior years. As a result, FE-1 explained that anyone forecasting "business as usual" throughout 2025, as Gartner did publicly, would have had to be ignoring obvious indicators.

116. Similarly, FE-7 went on to recall that many of his clients did not stay with Gartner, and some were retained but with lesser CV, and that the CV for his book of business along with his colleagues as a whole declined in 2025. FE-7 described the decreasing CV that he and his colleagues experienced becoming very apparent at the beginning of 2025 and continuing throughout 2025. For contracts coming up for renewal in 2025, FE-7 recalled that clients cited AI as the primary reason for not renewing because given the economic climate, AI provided much of the research that Gartner had previously supplied. FE-7 added that even when clients renewed their contracts in 2025, they were renewed at lesser CV.

117. Gartner's midsized enterprise segment was also suffering from massive customer cancellations and CV contraction during this time. For example, FE-9 was a business development manager in Global Technology Sales for the mid-sized enterprise segment. FE-9 explained that sales slowed significantly during the relevant period (2025) and that it became meaningfully harder to sell Gartner's products. According to FE-9, this sentiment was widely shared across the sales organization, with many sales representatives openly complaining that it was far more difficult to close deals than it had been previously.

118. Further, with respect to internal expectations and forecasting, FE-9 recalled sales managers acknowledging that teams were unlikely to hit historical performance numbers. Sales managers recognized that market conditions had changed, including increased pricing and shifts in buyer behavior driven by the rise of AI. Specifically, FE-9 emphasized that many companies were instead choosing to invest in AI products or internal AI initiatives, which were significantly less expensive than Gartner's offerings and, in the view of prospects, delivered comparable insight.

119. Similarly, FE-5 stated that sales conditions in 2025 were particularly difficult. He recounted that his own personal quota attainment was less than 50% of his prorated goal during

2025, due to competition from cheap AI. At the regional level, he estimated that by approximately the halfway point of 2025, the region had achieved less than 25% of its annual quota despite an expectation that roughly 50% attainment would ordinarily have been achieved at that point.

120. Additionally, according to FE-6, who was an Account Executive, Mid-Sized Enterprise on the legal-focused assurance team, he observed a change in Gartner's internal treatment of artificial intelligence during 2025. By early to mid-2025, FE-6 described a growing sense that teams needed to maintain or increase their sales pace in order to offset emerging challenges, including client hesitancy and competitive pressures associated with AI. FE-6 personally had two clients opt not to renew in mid-2025 explicitly due to efforts to cut costs and the availability of cheaper AI alternatives. The extent and significance of client pushback and cancellations due to cheaper generative AI alternatives led Defendants to implement additional training systems for how to address these AI-related objections.

121. For instance, around June or July 2025, FE-6 said, Gartner implemented a company-wide training initiative devoted specifically to handling customer objections involving AI. The training used an AI-driven simulation tool, in which a virtual AI "client" raised common objections and then evaluated the employee's response. FE-6 said he believed the training was designed to be industry-neutral and deployed across multiple divisions. FE-6 explained that the training initiative followed, or at least coincided with, a period in which clients had already begun raising AI-related objections and, in some cases, canceling memberships for that reason. While company leadership continued to frame AI as an opportunity and maintained an optimistic tone, FE-6 recalled internal discussions frequently centered on account executives encountering AI-related resistance from clients and how those objections were being managed.

122. Further, FE-13 described a broad corporate initiative focused on helping employees articulate the value of Gartner relative to AI. According to FE-13, the scale of this initiative suggested leadership recognized that AI posed a genuine competitive threat. He explained that if Gartner was investing substantial effort training employees to explain why customers should continue paying for Gartner services instead of relying on AI-generated answers, that indicated significant underlying concern about retention and customer demand.

123. Other Gartner divisions were seeing similar cancellations in 2025. For instance, FE-7 was part of Gartner's Start-up division that managed and sold Gartner's insights product to start-up companies in the New England and Mid-Atlantic regions. According to FE-7, he and his colleagues experienced decreasing CV throughout 2025 that was mostly due to their customers utilizing artificial intelligence which provided similar insights and research for free rather than contracting with Gartner. Start-up clients, according to FE-7, increasingly discovered that they could find similar information or the information they required by using third-party AI tools. FE-7 described AI as having become the competitor for Gartner, as opposed to competition from another Gartner-like company in the industry.

124. Contract cancellations also became rampant in Gartner's European business. For instance, according to FE-8, who was a Senior Sales Manager, leading a team that sold Gartner's products to clients in the Company's Nordic region, in March 2025, the forecasting for Gartner's European contract renewals "hitting a wall" with forecasting for the subsequent quarter showing "negative numbers," and not recovering through the end of his tenure in October 2025.

125. Specifically, according to FE-8, around the end of Q1 2025, he saw signs that the market was slowing down when he and his colleagues "couldn't renew any contract." The lack of renewals continued through February, March, April and into Q2 2025 where FE-8 and his team

were getting pushback from clients saying they did not see any value in renewing contracts with Gartner. FE-8 explained that 83% was the normal renewal rate which he suggested was down to 50% by March 2025 and that was when Michelle van Maris[7] and Hafeez Hameed[8] became "very worried." FE-8 attributed the lack of renewals to clients having to reduce spending and feeling that Gartner's value to them did not exceed the price by early 2025.

126. Indeed, Gartner's internal system showed weak sales performance across different sectors. For example, FE-8 advised that Gartner used a sales quota platform that was visible to everyone in the sales organization called Stack Rankings. FE-8 described the Stack Rankings in early 2025 as "looking like a bloody mess." According to FE-8, the Stack Rankings he witnessed in February or March 2025 indicated to him that very few sales teams were actually performing well. Specifically, FE-8 recalled that according to the Stack Rankings he reviewed, no other teams outside of the public sector were meeting their quotas as of February or March of 2025.

127. FE-7 observed the same decline via Stack Rankings. According to FE-7, his team would review Stack Rankings on a quarterly and annual basis. He also recalled receiving detailed presentations of "best performers" and those who when over their goals. He described how Stack Rankings indicated that sales and contract renewals had declined because the percentage of sales personnel who were "over" their goals was lower.

128. Likewise, FE-2 explained that there was a "massive disconnect" between what account executives were observing in the field with their customers and what senior leadership—including Defendant Hall and other top executives—were communicating about the state of the business to the public. As one example of that disconnect, FE-2 explained that despite leadership's

[7] Michelle van Maris was the Area Vice President, High Tech and Telco.
[8] Hafeez Hameed was the Managing Vice President.

public claims of strong sales performance, account executives across the enterprise struggled to meet their sales targets.

129. FE-2 explained that, prior to August 2025, account executives who attained at least 120% or more of their sales target qualified for the Winner's Circle, an achievement which Group Vice President Angelia Beaulieu would announce in a congratulatory email circulated to the regional organization. According to FE-2, beginning in 2024, these congratulatory emails had become increasingly rare. By August 2025, so few account executives qualified for Gartner's "Winner's Circle"—the Company's recognition program for its highest-performing salespeople—that the Company was forced to lower the performance threshold necessary for inclusion.

### 2. Defendants Sacrificed CV Growth to Retain Clients by Offering Price Concessions

130. As a result of the worsening demand trend, and to reverse further CV growth decline, Defendants allowed clients to renew without the standard 3 to 4% price increase, which accordingly cut into Gartner's reported CV growth.

131. For example, FE-3 recalled efforts were made to save deals by giving incentives to customers to renew early, such as granting a "flat" renewal – meaning renewing at the same rate, as opposed to the standard annual 3% fee "uplift" which Gartner typically charged. FE-3 advised that, by late 2025, Gartner had made it a regular practice to offer "flat" early renewals, to lock in the old rate with no 3% increase. He explained that this incentive had to be approved by the "Deal Desk" before it was offered to customers.

132. Likewise, according to FE-6, Gartner introduced a greater number of incentives than in prior periods to retain clients, including offering to hold pricing flat—eliminating the customary annual increases—if clients agreed to renew early, particularly by renewing in the third quarter of 2025, as opposed to Q4. FE-6 emphasized that such "hold flat" arrangements were not

typical in prior years and represented a notable change in sales strategy. FE-6 believed that the widespread use of these concessions likely resulted in contract value growth declining or, at best, remaining flat relative to historical trends.

133. Critically, these price concessions directly contradict Gartner's long-standing practice of implementing a 3 to 4% price increase each year at renewal, and, therefore, were hidden from investors. For example, during the November 5, 2024 earnings call, Defendant Safian stated: "[W]e've ranged between 3% and 4% price increases for 15-plus years . . . And so, rolling into 2025, we're shade under 4% in terms of the structural price increase."

134. Accordingly, as revealed by Defendants' disclosures starting in August 2025, while the price concessions temporarily helped retain some clients, they came at the cost of reduced contract values, ultimately causing CV growth and wallet retention to continue to decline.

### F. In April 2025, Defendants Created a Cancel Council to Diagnose Mass Contract Cancellations

135. In response to the worsening problems within the Research segment, Defendants established internal, executive-led committees and teams to monitor and slow the pace of contract cancellations, lapsed renewals, reduced spending, and declining CV growth. For example, by April 2025, the number of contract cancellations had reached such a tipping point that the C-Suite established a Cancel Council to scrutinize each contract cancellation over $400,000 and understand the reasons behind each cancellation.

136. According to FE-4, in addition to the Growth and Retention Team meetings, FE-4 explained that Gartner's C-suite was also informed about declining CVs due to AI through a "Cancel Council" created in approximately April 2025 by executive leadership concerned about the proliferation of cancelled contracts. According to FE-4, the purpose of the Cancel Council was to act as a postmortem to understand why contracts were being cancelled.

137. FE-4 recalled that the Cancel Council meetings were held on Teams video calls and that, in addition to himself, the attendees included executives from sales, product development, the Growth and Retention Team, along with other departments, and that Group Vice President - Global Enterprise North America and Europe Tim Stark led the meetings.

138. According to FE-4, Senior Vice President Global Technology Sales, Dick van Ham and 3 or 4 layers of sales leadership reporting up to him, and also product leaders and other leaders from across Gartner also attended the Cancel Council, with all of the attendees trying to "connect what went wrong." FE-4 recalled hearing from colleagues that some of the C-suite may have attended some of the meetings that he was not present for.

139. During these meetings, it was clear that contract cancellations were the result of the availability of cheaper AI alternatives. For example, according to FE-4, during these meetings, if a client cancelled or failed to renew a contract at a loss of $400,000 or more, the account executive and the account executive's manager had to explain to the Cancel Council why the contract had been cancelled.

140. FE-4 presented before the Council in mid-2025. For this presentation, he prepared a deck in a Gartner live Google document beforehand, and then he and the account executive who reported to him then explained to the Cancel Council why one of their large accounts renewed its contract at half of its previous contract value, or approximately $1,000,000. According to FE-4, the reason for the cancellation he gave to the Cancel Council was AI, explaining to the Cancel Council that the client explained to him that AI could provide similar information at a fraction of Gartner's price.

### G. Defendants Continued to Mislead Investors About the Demand for the Research Segment on May 6, 2025

141. Just one month later, even as the widespread impact of AI on the Research segment worsened, Defendants continued to mislead investors. On May 6, 2025, Defendant Safian again falsely touted the Research segment's strong retention metrics by saying: "***client retention is holding up really well and looks pretty good and will look even better or modestly better, if we excluded US federal from it***." While knowing that his publicly reported retention statements were completely divorced from reality, Defendant Safian reiterated that "***[b]ut overall the retention numbers are holding up pretty well. And again, you can see that in both the GTS and GBS client and wallet retention numbers***."

142. Defendant Safian's statements were false and misleading. In truth, Defendant Safian knew that the Research segment had already experienced widespread contract cancellations, as well as reduced seats and spending, due to the availability of cheaper AI alternatives and the quality of Gartner's product. *See* ¶¶72, 75-106, 112-40, *supra*. Further, Gartner's efforts to retain clients through price concessions in the form of hold-flat arrangements, which temporarily propped up the reported client "retention numbers" but simultaneously eroded the Company's CV growth and wallet retention. *See* ¶¶130-34, *supra*.

143. But with Defendants' reassurances, analysts agreed that Gartner's business remained strong. For instance, on May 7, 2025, Jefferies Research concluded that "demand is holding up reasonably well in light of the broader uncertainty . . . the fundamentals of the business appear better to us than the optics of the quarter would suggest." Similarly, Goldman Sachs Research observed that "Gartner is seeing steady Research CV growth in the high-single-digits among enterprise functional leaders [excluding] federal government despite macro uncertainty, an affirmation of the company's essential product offerings and resilient business model."

144. Following Defendants' false and misleading statements on May 6, 2025 and while Gartner's stock remained artificially inflated, between May 12, 2025 and May 13, 2025, Defendant Safian sold 7,095 shares at an average price of $448.50 per share for total proceeds of $3,182,107.

**H. The Truth Began to Emerge on August 5, 2025 as Gartner Reported Declining CV Growth**

145. Leading into the Company's Q2 2025 earnings, investors were closely tracking CV growth to determine whether Defendants had truthfully told investors Gartner was merely experiencing transient macroeconomic headwinds as opposed to an existential threat to Gartner's business from AI. For example, on July 31, 2025, Morgan Stanley Research wrote about the upcoming earnings announcement and highlighted that "the most important metric this quarter will be GTS CV growth ex. Fed," meaning CV growth for GTS excluding contracts with the federal government. Unaware of Defendants' fraud, analysts reasoned that because "the Gartner debate has been around AI-risk following ChatGPT's introduction of Deep Research," investors will look to GTS CV growth, excluding the federal business, to see if growth is indeed impacted by clients cutting seat licenses by switching to cheaper AI tools.

146. To the market's surprise, on August 5, 2025, Defendants disclosed that for the second quarter of 2025, the Company's CV growth was just 4.9%, a steep deceleration from the first quarter's 6.7% growth. Even when excluding the US federal contracts, CV growth was 6.4%, down from approximately 8% in the previous quarter. This showed that the CV decline was not solely attributable to macroeconomic factors like government budget cuts but reflected a broader, AI-related demand problem that Defendants had concealed from investors.

147. As a result, Defendants also lowered the Company's FY2025 guidance for total revenue from $6.535 billion to $6.455 billion and reduced the full year revenue outlook for the Research segment from at least $5.335 billion to at least $5.255 billion. Specifically, the reduced

FY2025 guidance partially reflected the Company's slowing CV growth, which unbeknownst to investors at that time, was caused by customers leaving Gartner or reducing their contracts in favor of alternative AI tools.

148. On this unexpected news, the market reacted with shock, and on August 5, 2025, Gartner's stock price dropped 27.55% in a single day (the largest drop in the Company's history), or a reduction of $92.78 per share, bringing the stock price down from $336.71 per share to $243.93 per share at closing.

149. Defendants' disclosure revived investors' concerns over AI disruption. The next day, for example, William Blair Research emphasized that "the magnitude of the selloff (-28%) undoubtedly surpassed even our most pessimistic expectations" and pointed out that "**growing concerns about the potential disruption risk from generative AI (e.g., LLM's deep research capabilities) are a clear driver to the stock's de-rating** . . . ." As described below, however, Gartner's stock remained artificially inflated because Defendants continued to conceal the adverse impact of AI on Gartner's business.

### I. Defendants Reassured Investors and Denied Seeing Any Impact from AI on Gartner's Business

150. During the August 5, 2025 earnings call, as analysts tried to understand what caused the slowdown in the Company's CV growth, they pressed Defendants about generative AI's impact on Gartner's business. However, in response, Defendants unequivocally denied that the availability of cheaper AI tools had displaced the Research segment's services, and falsely claimed there was not any reduced demand from AI. For instance, in response to an analyst question about whether "AI could be having some sort of impact on the demand of your services," Defendant Hall flatly rejected the question, claiming that "***there's not reduced demand***."

151. Similarly, an analyst continued to try to confirm that AI was not impacting Gartner's business, asking specifically about whether Defendants had seen any cancellations because of AI:

> [Y]ou talked about the fact that every time you have a cancellation, you'll find out what the what the reason why it was. Are you able to give us any sense what percentage of folks are citing usage of like a publicly available large language model and therefore not continuing their Gartner subscriptions that are coming up at all? What percentage is that?

152. Defendant Hall again squarely denied any reduced demand from AI, stating: "Yeah. That's one of the options and ***it's not material***. ***It's basically – it's essentially unmeasurable***." Then, Defendant Hall added that, "Pipeline was up a very good double-digit rate for GTS and GBS. ***And we basically see that as, again, there's demand for – high demand for our services***. . . . And so, ***our pipeline is up because there's strong demand out there for our services***."

153. Defendant Hall's statements, however, were materially false and misleading because they rejected investor concerns and concealed that AI was disrupting Gartner's business and causing declining demand and lower CV growth and wallet retention. Indeed, contrary to Defendant Hall's statement, within the Research segment, clients had been refusing to renew their contracts and significantly reducing their seats and spending due to customers' dissatisfaction with the quality, value, and pricing of Gartner's products and the availability of cheaper generative AI alternatives. *See* ¶¶72, 75-106, 112-40, *supra*. In fact, around April 2025, contract cancellations became so severe that Defendants established a Cancel Council to track and diagnose each contract cancellation. *See* ¶¶135-40, *supra*.

154. Critically, according to FE-2, Hall's August 2025 statement that the impact of AI was "not material" and "essentially unmeasurable" was inconsistent, at least with respect to the high-tech and end-user divisions in his region, with the facts known internally, including consistent

feedback from customers and declining contract renewals, which showed that AI was a material driver of customer decisions against renewals and declining CV.

155. Despite their prior concerns, analysts were reassured by Defendants' insistence that AI had no measurable impact on Gartner's business. For instance, on the same day, Deutsche Bank Research reiterated that "[m]anagement is currently not attributing any of the slowdown to AI (company tracks the reason for every loss), believing their proprietary data and insights help clients with complex, mission-critical priorities." Likewise, Wells Fargo echoed Defendants' optimism that "headwind from client dropping Gartner to use publicly available LLMs" was "immaterial."

156. Investors remained focused on AI-related disruption and the threat it posed to Gartner's business and CV growth. As RBC Capital Markets wrote on September 8, 2025, "[i]nvestors remain concerned that deep research capabilities from large language models (LLMs) could disrupt Gartner's competitive position," and as a result, RBC Capital Markets wanted "greater clarity on concerns surrounding Generative AI disintermediation and would like to see a reacceleration in CV growth before adopting a more constructive stance." Nevertheless, RBC Capital Markets echoed Defendants' claims that "the recent weakness [wa]s largely cyclical" and not tied to AI disruption to its business model.

### J. The Truth Was Further Revealed on November 4, 2025, as Gartner Disclosed Worsening CV Growth Deceleration, and Defendants Continued to Deny Any AI Disruption

157. On November 4, 2025, Defendants announced financial results for the third quarter of 2025, revealing that CV growth further decelerated from the second quarter's 4.9% to 3%, well below the market's expectations. Even when excluding the federal contract cancellations due to federal government budget cuts, CV growth still declined by 0.7% from 6.4% to 5.7% in the third quarter. Further, new business declined 4% year over year. In response, Gartner's stock price

dropped 7.62%, or a reduction of $18.75 per share, bringing the stock price down from $245.92 per share to $227.17 per share at closing.

158. Notwithstanding the partial disclosure of the truth concerning weak demand within the Research segment and declining CV growth due to the availability of cheaper AI alternatives, Defendants continued to mislead investors. For instance, during the earnings call on the same day, an analyst asked: "As we've had more conversations with customers and prospects, how often does LLM, if any, comes [sic] up in those conversation as an alternative to Gartner?" Once again, Defendant Hall denied seeing any impact on Gartner's business from AI, stating:

> ***If you look at, like, on a deal level, how many deals do – does the client say, hey, I'm thinking about using AI instead of using Gartner, it would be extremely small***. We track – as I talked about in the past, in our system, we actually ask our salespeople to track it. . . . And basically, ***in terms of when a client actually says, hey, I'm thinking about using Gartner versus literally AI, that comes up at very, very, very small number of transactions***.

159. Analysts were again comforted by Defendants' false statements. For example, on the same day, Barclays Research wrote, "Management reiterated that based on customer feedback, cancels are not due to LLM/GPT alternatives – it remains a '**very very**' small number of transactions." Similarly, William Blair cited Defendant Hall's affirmation that "displacement from AI is '**extremely small**.'"

### K. The Full Truth was Finally Revealed on February 3, 2026 When Defendants Announced the Lowest CV Growth in a Decade

160. On February 3, 2026, Defendants announced Gartner's financial results for the fourth quarter of 2025. This announcement revealed that for the fourth quarter, CV growth was only 0.8%, the Company's lowest CV growth in a decade. Excluding federal contract cancellations, CV growth declined from approximately 6% in the third quarter to 4% in the fourth quarter. Moreover, wallet retention dropped to a five-year low of 97.5%, signaling significantly reduced CV.

161. Critically, during the earnings call on the same day, Defendants abandoned their prior statement that Gartner would return to "high-single-digit" CV growth by year-end 2026. Rather, Defendants only stated that CV growth would accelerate over the course of 2026 and finally acknowledged a worsened outlook for the Research segment.

162. Further, Defendant Hall also admitted for the first time that the massively declining CV growth was the result of "a much tougher selling environment," which analysts immediately connected to their prior misrepresentations that AI was not reducing demand for Gartner's services.

163. For example, on the same day, MarketWatch posted an article stating that Gartner's stock "got slammed" and noted that "Gartner closed at their lowest level in five years, underscoring how artificial intelligence is disrupting the landscape for professional research and consulting." The article further noted that "[t]he company's commentary on the market backdrop signaled sustained challenges due to AI."

164. On this final revelation, Gartner's stock price declined 20.87% in a single day (one of the largest drops in the Company's history), or a reduction of $42.24 per share, bringing the stock price down from $202.40 per share to $160.16 per share at closing.

165. Analysts quickly linked the stock drop to the disclosure. On the same day, Deutsche Bank Research explained, "Gartner stock declined ~22% today on a CV miss and lack of commitment to +HSD 2026 CV growth previously cited by management." Notably, UBS Research wrote: "the CV print is likely worse than most investor expectations, even as the most bearish investors might have had lower estimates."

166. Analysts also linked the CV decline directly to AI disruption. For instance, on February 4, 2026, Wells Fargo sharply observed that, "the miss reflects AI-driven pressure, with

clients downsizing contracts in favor of LLM tools." Likewise, Goldman Sachs wrote: "We believe that there is also potential that competitive displacements by AI . . . are contributing to the growth deceleration." Deutsche Bank Research also concluded that "taking a clue from software and IT services sectors there is often no floor to valuation when the market has decided that AI is a risk to the business model." UBS Research added, "As long as CV continues to be sluggish, the narrative of AI headwind remains unanswered."

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

167. Plaintiffs allege that Defendants' statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware of or were reckless in not knowing. As alleged herein, Defendants made numerous materially false and misleading public statements and omissions throughout the Class Period, including in investor earnings calls, press releases, and SEC filings. Those materially false and misleading statements and omissions concerned the true demand for Gartner's Research segment—including, for example, its CV growth, retention, client spending, and the impact of competition from AI.

168. As alleged herein, these statements artificially inflated or maintained the price of Gartner common stock and operated as a fraud or deceit on all persons or entities that purchased or otherwise acquired those securities during the Class Period. Because Defendants chose to speak on the issues described below, they had a duty to fully, completely, and truthfully disclose all material facts and information necessary to provide an accurate portrayal of those issues. As described below, Defendants created an impression of a state of affairs at Gartner that differed in a material way from the one that actually existed.

**A. July 30, 2024 – Q2 2024 Earnings Call**

169. On July 30, 2024, Gartner released its financial results for Q2 2024. During the associated earnings call that same day, Defendants assured investors that softness in the first quarter's CV growth was attributable to external macroeconomic conditions, and "barring a meaningful shift in the macro or geopolitical environment," the Company's CV growth would reaccelerate. For example, Defendant Safian touted, "Second quarter contract value grew 7% year-over-year, accelerating about 50 basis points from Q1. ***We believe the first quarter marked the bottom for CV growth this cycle***."

170. Later in the earnings call, an analyst asked:

> When you kind of reiterated that you think Q1 marked the bottom for CV growth with the macro and geopolitical caveats, you said growth may vary quarter to quarter. I just want to, I guess, zoom in on what you're trying to signal there. Is that just an acknowledgment of, I guess, the volatile end market environment? Or are you expecting that you expect deceleration at some point in the near future, because of like a known year-over-year comp issue or anything else that you're seeing?

171. In response, Defendant Safian reiterated, "***I think the core message is 6.9% marks the bottom, and we should be above that in every quarter moving forward, it could bounce around a little bit, and then ultimately, our medium-term objective is to get both GTS and GBS back to 12% to 16% annual growth rates***."

172. Defendant Safian's statements in ¶¶169 and 171 were false and misleading because they conveyed the misleading impression that the Company's CV growth had bottomed at 6.9% and any prior deceleration or "bounc[ing]" was the product of transitory macroeconomic and geopolitical factors, when in truth, Gartner was already experiencing widespread cancellations, reductions in seats and spending, and decreased demand because of customer dissatisfaction with the quality, value, and pricing of Gartner's products and the availability of cheaper alternatives from AI. *See* ¶¶72, 75-106, *supra.* The statements were also false and misleading because they

conveyed the misleading impression that Defendants had a reasonable basis supporting the statement that CV growth would be above 6.9% in every quarter moving forward when, in fact, Gartner's internal reports or information contradicted Defendants' public statements and showed widespread contract cancellations, reductions in seats and spending, and decreased demand. *See id.* The statements were further false and misleading because they omitted material facts undermining the accuracy of the statements, including that Gartner was experiencing widespread cancellations, reductions in seats and spending, and decreased demand because of customer dissatisfaction with the quality, value, and pricing of Gartner's product and the availability of cheaper alternatives from AI. *See id.*

173. Specifically, FE accounts demonstrate that beginning no later than July 2024, the Research segment had already started to experience weak demand, contract cancellations, and reduced spending. *See* Section IV.C, *supra*.

**B. November 5, 2024 – Q3 2024 Earnings Call**

174. On November 5, 2024, Defendants announced financial results for Q3 2024. During the associated earnings call that same day, Defendant Safian added, "CV grew high single digits in the quarter, and ***we believe the first quarter of 2024 was the bottom for CV growth in this cycle***."

175. Defendant Safian's statement in ¶174 was false and misleading for the same reasons detailed in ¶¶172-73. Specifically, unbeknownst to investors, Defendants knew that CV growth had not bottomed because the Research segment experienced widespread contract cancellation and retention problems due to the availability of cheaper AI alternatives, and as a result, Defendants knew that CV growth would not accelerate, but rather, was declining and would continue to decline as clients did not renew (or renewed at a lower CV). *See* Section IV.C, *supra*.

176. Then, during the same earnings call, an analyst asked:

> So last quarter, you suggested that the Q1 CV would be the bottom, but that the path of recovery may be uneven . . . what did you see that caused you to make that uneven comment? And as we stand here in Q3, what do you think about the pace going into Q4 in terms of CV?

177. Defendant Hall again assured investors that other than the volatile macro environment, the Company was not seeing any other negative trends, stating:

> [I]f you look at our contract value, in any given quarter, there are certain set of renewals that come up. It varies from quarter-to-quarter. ***And if there's more renewals in one quarter than another or one slips a quarter, that's kind of what's responsible for the kind of the quarter-to-quarter variation*** . . . And so ***you just see the normal variation in terms of what SKU of renewals, a new business deal may get pushed in another quarter***. ***We see great demand from our clients on the issues you'd expect***, so like cybersecurity, how do they use artificial intelligence, data and analytics . . . . ***And again, it's a rocky macroeconomic situation right now***.

178. Defendant Hall's statements in ¶177 attributing varying quarterly CV to "quarter-to-quarter variation," "normal variation," and "rocky macroeconomic situation" were false and misleading because they conveyed the misleading impression that the Company's CV growth had bottomed at 6.9% and any prior deceleration was the product of transitory macroeconomic and geopolitical factors, when in truth Gartner was already experiencing widespread cancellations, reductions in seats and spending, and decreased demand because of customer dissatisfaction with the quality, value, and pricing of Gartner's products and the availability of cheaper alternatives from AI. *See* ¶¶72, 75-106, *supra.*

179. Defendant Hall's statements touting "great demand" were further false and misleading because they omitted to disclose facts undermining the accuracy of the statement, including that Gartner was experiencing widespread cancellations, reductions in seats and spending, and decreased demand because of customer dissatisfaction with the quality, value, and pricing of Gartner's product and the availability of cheaper alternatives from AI. *See id.*

180. Later in the earnings call, an analyst asked: "I wanted to drill down on client spending more broadly in the quarter and just see how it trended relative to your expectations. And then, any color you can add thus far into the fourth quarter?"

181. In response, Defendant Safian stated: "Again, ***I wouldn't say we saw anything different from a client spending or an end market perspective***. . . . So, ***I think there's no big change from a client spending perspective or any external trend like that, more of the same***."

182. Defendants Safian's statement in ¶181 concerning "no big change from a client spending perspective," was false and misleading because it omitted to disclose facts undermining the accuracy of the statement, including that Gartner was experiencing widespread cancellations, reductions in seats and spending, and decreased demand because of customer dissatisfaction with the quality, value, and pricing of Gartner's product and the availability of cheaper alternatives from AI. *See* ¶¶72, 75-106, 112-40, *supra*. Specifically, as demonstrated by FE accounts, by that time, clients had already started reducing their spending and seats with Gartner and were unwilling to renew their contracts. *See* Section IV.C, *supra*.

**C. February 4, 2025 – Q4 2024 Earnings Call**

183. On February 4, 2025, Gartner released its financial results for Q4 2024. During the earnings call on the same day, an analyst asked: "Are you saying that the 7.8% that you reported in 4Q, is that expected to be the bottom here and each quarter should be above that? Or could it potentially be a more sort of rough path from here?" In response, Defendant Safian affirmed the Company's expectations for CV growth rate in 2025, stating:

> ***[W]hen we exit 2025, we would expect to be higher than 7.8%. . . . more so that the trend will be that we'll exit 2025 higher than 7.8% and, again, with a goal towards continuing to accelerate to, first, double-digit and then to our medium term objective of 12% to 16%***.

184. Defendant Safian's statement in ¶183 was false and misleading because it conveyed the misleading impression that Defendants had a reasonable basis supporting the statement that CV growth would be above 7.8% at the end of 2025 when, in fact, Gartner's internal reports or information contradicted Defendants' public statements and showed widespread contract cancellations, reductions in seats and spending, and decreased demand. *See* ¶¶72, 75-106, 112-40, *supra.* The statement was further false and misleading because it omitted to disclose facts undermining the accuracy of the statement, including that Gartner was experiencing widespread cancellations, reductions in seats and spending, and decreased demand because of customer dissatisfaction with the quality, value, and pricing of Gartner's product and the availability of cheaper alternatives from AI. *See id*. Specifically, unbeknownst to investors, Defendants knew that CV growth had not bottomed because (i) the Research segment experienced widespread contract cancellation and retention problems due to the availability of cheaper AI alternatives; (ii) Defendants offered price concessions in the form of hold-flat arrangements to retain clients and to stem further CV growth decline; and (iii) as a result, Defendants knew that CV growth would not accelerate, but rather, was declining and would continue to decline as clients did not renew (or renewed at a lower CV). *See id*.

185. Defendant Safian later reported: "***Wallet retention for GTS was 102% for the quarter***, ***reflecting net growth even before the addition of new clients***" and "***Wallet retention for GBS was 106% for the quarter***, ***reflecting strong net growth with our existing clients***."

186. Defendant Safian's statements in ¶185 were false and misleading concerning "net growth" and "strong net growth with our existing clients" because while touting wallet retention for GTS and GBS, Defendants were obligated but failed to disclose the adverse information demonstrating that widespread cancellations, reductions in seats and spending, and decreased

demand because of customer dissatisfaction with the quality, value, and pricing of Gartner's product and the availability of cheaper alternatives from AI. *See* ¶¶72, 75-106, 112-40, *supra*. The statements were also false and misleading because Defendants concealed that the wallet retention numbers were artificially propped up by price concessions offered to retain clients, which did and would continue to cause CV growth to decline. *See* ¶¶130-34, *supra*. Specifically, as Defendants observed rampant contract cancellations and retention problems, FE testimony confirms that Defendants used price concessions in the form of hold-flat arrangements as an incentive to retain clients and to stem further CV growth decline. *See id*.

187. Further, during the same earnings call, another analyst asked: "I was wondering if you could talk about the selling environment. I noticed that the GTS wallet retention improved nicely this quarter. So, I wonder if any change you've noticed there in terms of selling and renewals."

188. Defendant Hall answered: "So, ***I would say the selling environment is unchanged***, but our level of execution continues to improve. So, I think the improvement you're seeing across the business is due to improved execution on our part."

189. Defendant Hall's statement in ¶188 describing the selling environment as "unchanged" was false and misleading because in reality, the selling environment had further deteriorated due to customer dissatisfaction and the availability of cheaper AI alternatives, which all caused Gartner's CV growth to decline. *See* ¶¶72, 75-106, 112-40, *supra*. Specifically, as recounted by several former employees, the selling environment had completely changed: starting in 2024 and continuing into 2025, clients significantly reduced their spending, canceled their contracts, and refused to renew their existing contracts because of customer dissatisfaction with

the quality, value, and pricing of Gartner's product and the availability of cheaper alternatives from AI. *See id*.

### D. May 6, 2025 – Q1 2025 Earnings Call

190. On May 6, 2025, Gartner announced financial results for Q1 2025. During the earnings call held on the same day, Defendant Safian touted Research's strong retention metrics by saying:

> ***So client retention is holding up really well and looks pretty good and will look even better or modestly better, if we excluded US federal from it***. ***So retention rates broadly continue to look pretty good***. I think the challenge and Gene alluded to this earlier is, our sales cycles from both a new logo perspective and also from an upsell perspective have lengthened and that impacts the wallet retention numbers. And so you're seeing a little bit of that new business velocity impacting the wallet retention numbers. ***But overall the retention numbers are holding up pretty well. And again, you can see that in both the GTS and GBS client and wallet retention numbers***.

191. Defendant Safian's statements in ¶190 touting client retention and wallet retention were false and misleading because they omitted to disclose facts undermining the accuracy of the statement, including that Gartner was experiencing widespread cancellations, reductions in seats and spending, and decreased demand because of customer dissatisfaction with the quality, value, and pricing of Gartner's product and the availability of cheaper alternatives from AI. *See* ¶¶72, 75-106, 112-40, *supra*. The statements were also false and misleading because Defendants concealed that the wallet retention numbers were artificially propped up by price concessions offered to retain clients, which did and would continue to cause CV growth to decline. *See* ¶¶130-34, *supra*. Specifically, as Defendants observed rampant contract cancellations and retention problems, FE testimony confirms that Defendants used price concessions in the form of hold-flat arrangements as an incentive to retain clients and to stem further CV growth decline. *See id*.

**E. August 5, 2025 – Q2 2025 Earnings Call**

192. On August 5, 2025, Defendants disclosed financial results for Q2 2025. During the earnings call held on the same day, Defendant Hall touted: "Pipeline was up a very good double-digit rate for GTS and GBS. And ***we basically see that as, again, there's demand for – high demand for our services***. . . . And so, ***our pipeline is up because there's strong demand out there for our services***."

193. Defendant Hall's statement touting "high" and "strong" demand in ¶192 was false and misleading because they omitted to disclose facts undermining the accuracy of the statement, including that Gartner was experiencing widespread cancellations, reductions in seats and spending, and decreased demand because of customer dissatisfaction with the quality, value, and pricing of Gartner's product and the availability of cheaper alternatives from AI. *See* ¶¶72, 75-106, 112-40, *supra*.

194. Later in the earnings call, in response to an analyst question about whether "AI could be having some sort of impact on the demand of your services," Defendant Hall answered:

> I mentioned earlier that a lot of deals were being escalated from the functional leader like a CIO or CHRO up to the CFO or CEO. It takes more time, the selling process because business case that just it takes time organizationally for that to get done. And so what I think we're seeing is ***there's not reduced demand***, but closing deals takes longer because the purchasing processes have been stretched out. And that's, pretty pervasive and what we've seen in recessions in the past.

195. Defendant Hall's statement in ¶194 was false and misleading because Gartner was seeing ample evidence of reduced demand because of AI, including widespread cancellations, reductions in seats and spending, and retention problems. *See* ¶¶72, 75-106, 112-40, *supra*. Specifically, unbeknownst to investors, Defendants knew that CV growth was declining because (i) the Research segment experienced widespread contract cancellation and retention problems due to the availability of cheaper AI alternatives; (ii) Defendants offered price concessions in the form

of hold-flat arrangements to retain clients and to stem further CV growth decline; and (iii) as a result, Defendants knew that CV growth would not accelerate, but rather, was declining and would continue to decline as clients did not renew (or renewed at a lower CV). *See id.*

196. Similarly, another analyst asked the following question about whether AI was causing reduced demand for Gartner's services:

> [Y]ou talked about the fact that every time you have a cancellation, you'll find out what the [sic] reason why it was. Are you able to give us any sense what percentage of folks are citing usage of like a publicly available large language model and therefore not continuing their Gartner subscriptions that are coming up at all? What percentage is that?

197. In response, Defendant Hall again dismissed any concern over AI risk and said: "Yeah. That's one of the options and ***it's not material***. ***It's basically – it's essentially unmeasurable***."

198. Defendant Hall's statement in ¶197 was false and misleading because Gartner had measurable evidence that showed the material impact of AI, including widespread contract cancellation and retention problems due to the availability of cheaper AI alternatives. *See* ¶¶72, 75-106, 112-40, 154, *supra*. Specifically, unbeknownst to investors, Defendants knew that CV growth had not bottomed because (i) the Research segment experienced widespread contract cancellation and retention problems due to the availability of cheaper AI alternatives; (ii) Defendants offered price concessions in the form of hold-flat arrangements to retain clients and to stem further CV growth decline; and (iii) as a result, Defendants knew that CV growth would not accelerate, but rather, was declining and would continue to decline as clients did not renew (or renewed at a lower CV). *See id.*

199. Moreover, the internal data told a very different story than the one Defendants told the market. According to FE-2, Hall's August 2025 statement that the impact of AI was "not

material" and "essentially unmeasurable" was inconsistent, at least with respect to the high-tech and end-user divisions in his region, with the facts known internally, including consistent feedback from customers and declining contract renewals, which showed that AI was a material driver of customer decisions against renewals and declining CV.

### F. November 4, 2025 – Q3 2025 Earnings Call

200. On November 4, 2025, Defendants announced financial results for Q3 2025. During the earnings call held on the same day, an analyst sought further clarification on whether the Company had seen clients replacing Gartner with alternative AI chatbots, asking: "As we've had more conversations with customers and prospects, how often does LLM, if any, comes [sic] up in those conversation as an alternative to Gartner?" In response, Defendant Hall answered:

> ***If you look at, like, on a deal level, how many deals do – does the client say, hey, I'm thinking about using AI instead of using Gartner, it would be extremely small***. We track – as I talked about in the past, in our system, we actually ask our salespeople to track it. We have follow-up calls with them. We have a lot of interactions. And basically***, in terms of when a client actually says, hey, I'm thinking about using Gartner versus literally AI, that comes up at very, very, very small number of transactions***.

201. Defendant Hall's statements in ¶200 downplaying and describing the instances in which clients raised replacing Gartner with generative AI tools as "***extremely small***" and "***very, very, very small number of transactions***" were false and misleading for the reason detailed in ¶¶198-99. In truth, the Research segment had experienced widespread contract cancellations, non-renewals, and reductions in seats and spending because clients had concluded that cheaper AI tools delivered comparable insights. *See* ¶¶72, 75-106, 112-40, *supra*. The statements were further false and misleading because, by that time, Defendants had abandoned Gartner's longstanding practice of mandating price increases and were instead offering price concessions to retain clients that had objected to Gartner's pricing given the availability of cheaper AI alternatives. *See* ¶¶130-34, *supra*.

## VI. LOSS CAUSATION AND ECONOMIC LOSS

202. Defendants' misstatements and omissions alleged herein directly and proximately caused economic loss (i.e., damages) suffered by Plaintiffs and the Class in violation of the federal securities laws. Throughout the Class Period, Defendants made materially false and misleading statements, half-truths, and omissions to defraud investors. Defendants' misstatements and omissions artificially inflated and/or artificially maintained the price of Gartner common stock and operated as a fraud and deceit on the Class.

203. During the Class Period, Plaintiffs and the Class relied on the integrity of the market when purchasing Gartner common stock at artificially inflated and/or artificially maintained prices, with Gartner's stock reaching as high as $551.80 per share on November 13, 2024, and were damaged thereby when the stock price declined after the truth was publicly revealed and/or the risks concealed by Defendants' misrepresentations and/or omissions materialized. The market for Gartner common stock was open, well-developed, and efficient at all relevant times, with an average daily trading volume of approximately 805,075 shares during the Class Period.

204. As a result of the disclosure of the truth of Defendants' fraud and/or materialization of the risks through the series of disclosures described below, investors incurred significant losses. The stock price declines during this period, including the declines summarized below, were directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' material misrepresentations and/or omissions. Each decline was a direct or proximate result of Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

205. The timing and magnitude of the declines in Gartner common stock evidence the impact that Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Plaintiffs and other Class members was caused by

changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

206. Specifically, Defendants made false and misleading statements and omissions about Gartner's CV growth, the demand for Gartner's Research segment, and the extent of which Gartner's business was impacted by the availability of cheaper AI alternative and customer dissatisfaction. Defendants' statements also concealed from investors that customer demand for the Company's products had declined significantly—due in part to the availability of cheaper AI tools—which caused and would continue to cause declining CV growth. When Defendants' prior misrepresentations and omissions were revealed to investors, the price of Gartner's common stock dropped significantly.

207. Gartner investors were injured as a result of Defendants' false statements and omissions which inflated or maintained the price of Gartner common stock. That inflation dissipated as the true reality of the health of Gartner's business and the risks AI posed to the Company's financial performance were revealed through the corrective disclosures alleged herein.

208. As described below, Defendants' misrepresentations and/or omissions were revealed to the market through a series of three corrective disclosures and/or materializations of concealed risk from August 5, 2025 through February 3, 2026, inclusive. It was not until the final corrective disclosure and/or materialization of concealed risk on February 3, 2026, that the full truth was known to the market, such that there was no longer any artificial inflation and/or artificial maintenance in Gartner's stock price attributable to the fraud. Before then, Defendants issued a series of statements that maintained some aspect of the artificial inflation, even as other aspects of the inflation dissipated as aspects of Defendants' misrepresentations and/or omissions were partially revealed.

### A. August 5, 2025 – First Partial Corrective Disclosure/Materialization of the Risk

209. On August 5, 2025, before market opened, the relevant truth and foreseeable risk concealed by Defendants' misrepresentations and omissions during the Class Period were partially revealed and/or partially materialized when Gartner disclosed its financial results for Q2 2025. Specifically, Defendants disclosed that CV growth was just 4.9%, decelerating from the first quarter's 6.7% CV growth. Even when excluding the US federal contracts, CV growth was 6.4%, down from approximately 8% in the previous quarter. Defendants also lowered the Company's 2025 guidance for total revenue from $6.535 billion to at least $6.455 billion and reduced the full year revenue outlook for Research from at least $5.335 billion to at least $5.255 billion. This reduced guidance for Full Year 2025 reflected the slowing CV growth.

210. Defendants' August 5, 2025 disclosure concerning decelerating CV growth, declining revenue, and reduced revenue guidance was the foreseeable consequence of, and within the zone of risk concealed by, Defendants' misrepresentations and/or omissions concerning Gartner's CV growth, the demand for Gartner's Research segment, and the extent of which Gartner's business was impacted by the availability of cheaper AI alternative and customer dissatisfaction.

211. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, Gartner's stock price dropped 27.55% in a single day, or a reduction of $92.78 per share, bringing the stock price down from $336.71 per share to $243.93 per share at closing on August 5, 2025.

212. The market quickly linked the stock decline to Defendants' disclosure concerning Gartner's CV growth deceleration and reduced revenue guidance. On the same day, Deutsche Bank Research explained, "Gartner stock reacted very negatively (-27.5% on the day) as the company

missed on CV growth and lowered its FY25 revenue and EBITDA guide." The next day, William Blair Research emphasized that "the magnitude of the selloff (-28%) undoubtedly surpassed even our most pessimistic expectations" and pointed out that "**growing concerns about the potential disruption risk from generative AI (e.g., LLM's deep research capabilities) are a clear driver to the stock's de-rating** . . . ."

213. However, Gartner's stock price remained artificially inflated after this news because Defendants continued to assure the market. For instance, during the earnings call held on the same day, amid analysts' relentless questions about generative AI's impact on Gartner's business, Defendants continued to bolster that the AI risk was overblown and denied that they had seen any impact on Gartner's business from AI. *See* Section V.E, *supra*.

214. In response, analysts were assured by Defendants' statements. For instance, on the same day, Deutsche Bank Research reiterated that "Management is currently not attributing any of the slowdown to AI (company tracks the reason for every loss), believing their proprietary data and insights help clients with complex, mission-critical priorities." Likewise, Wells Fargo echoed Defendants' optimism that "headwind from client dropping Gartner to use publicly available LLMs" was "immaterial."

### B. November 4, 2025 – Second Partial Corrective Disclosure/Materialization of the Risk

215. On November 4, 2025, before market opened, further elements of the relevant truth and foreseeable risks concealed by Defendants' misrepresentations and omissions during the Class Period were partially revealed and/or partially materialized when Defendants announced financial results for Q3 2025. On that day, Defendants disclosed that Gartner's CV growth further decelerated from the second quarter's 4.9% CV growth to 3% CV growth, well below the market's

expectation. Even when excluding the federal contracts, CV growth still decelerated by 0.7% from 6.4% to 5.7%.

216. Defendants' November 4, 2025 disclosure of further deceleration in CV growth was the foreseeable consequence of, and within the zone of risk concealed by, Defendants' misrepresentations and/or omissions concerning Gartner's CV growth, the demand for Gartner's Research segment, and the extent of which Gartner's business was impacted by the availability of cheaper AI alternative and customer dissatisfaction.

217. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, Gartner stock price dropped 7.62%, or a reduction of $18.75 per share, bringing the stock price down from $245.92 per share to $227.17 per share at closing.

218. As detailed above, that same day, analysts immediately attributed the stock price decline to the Company's disappointing announcement. For instance, UBS Research observed, "Gartner shares -8% on Tuesday after Q3 CV growth fell shy of expectations." Similarly, Deutsche Bank noted that "the stock reacted negatively (down ~-7.5pts) as NCVI (new bookings) came in at $13m (DBe at $17m) compared to Street at >$40m." Morgan Stanley Research also cautioned, "With macro uncertainty, potential pressure from AI, and continued Federal contract headwinds ahead, we see a difficult environment to accelerate in the next quarter."

219. Still, the Company's stock price remained artificially inflated even after this news because Defendants continued to deny that AI had not negatively impacted Gartner's business, thereby further concealing that in truth, Gartner was experiencing widespread cancellations, reductions in seats and spending, and decreased demand because of customer dissatisfaction with

the quality, value, and pricing of Gartner's product and the availability of cheaper alternatives from AI. *See* Section V.F, *supra*.

220. In response, analysts were again assured by Defendants' statements but remained unaware of the truth. For instance, on the same day, Barclays wrote, "Management reiterated that based on customer feedback, cancels are not due to LLM/GPT alternatives – it remains a 'very very' small number of transactions." Similarly, William Blair Research cited Defendant Hall's affirmation that "displacement from AI is 'extremely small.'"

**C. February 3, 2026 – Final Corrective Disclosure/Materialization of the Risk**

221. On February 3, 2026, before market opened, the remaining aspects of the relevant truth and foreseeable risks concealed by Defendants' misrepresentations and omissions during the Class Period were fully revealed and/or materialized when Gartner announced its financial results for Q4 2025, shocking analysts.

222. Specifically, for the fourth quarter, CV growth almost came to a halt, growing only by 0.8% as opposed to the 3% growth in the third quarter. Further, even when excluding the impact from federal contracts, CV growth still declined by 2%, from approximately 6% in the third quarter to 4% in the fourth quarter. Moreover, wallet retention rate dropped to a five-year low of 97.5%, signaling significantly reduced CV and client spending from the previous contract year. Critically, during the earnings call on the same day, Defendants walked back from their prior outlook issued during the Q2 2025 earnings call—Gartner would return to "high-single-digit" CV growth by year-end 2026. Rather, Defendants only stated that CV growth would accelerate over the course of 2026 and finally acknowledged a worsened outlook for the Research segment. As a result, Defendants announced 2026 revenue guidance of $6.455 billion compared to consensus revenue of $6.493 billion.

223. Further, Defendant Hall also admitted for the first time that the massively declining CV growth was the result of "a much tougher selling environment," which analysts immediately connected to their prior misrepresentations that AI was not reducing demand for Gartner's services. For example, on the same day, MarketWatch posted an article stating that Gartner's stock "got slammed" and noted that "Gartner closed at their lowest level in five years, underscoring how artificial intelligence is disrupting the landscape for professional research and consulting." The article further noted that "[t]he company's commentary on the market backdrop signaled sustained challenges due to AI."

224. Defendants' February 3, 2026 disclosure concerning declining CV growth, declining wallet retention rate, a tougher selling environment, and lowered outlook for 2026 CV growth was the foreseeable consequence of, and within the zone of risk concealed by Defendants' misrepresentations and/or omissions concerning Gartner's CV growth, the demand for Gartner's Research segment, and the extent of which Gartner's business was impacted by the availability of cheaper AI alternative and customer dissatisfaction.

225. As a direct and proximate result of this final corrective disclosure and/or the materialization of foreseeable risks concealed by Defendants' fraud, Gartner's stock price dropped 20.87%, or a reduction of $42.24 per share, bringing the stock price down from $202.40 per share to $160.16 per share at closing.

226. Analysts were shocked and quickly connected the stock price decline to Defendants' disclosure. For example, in response to the Company's disclosures on February 3, 2026 regarding CV growth decline and worsened outlook for Research, that same day, Deutsche Bank Research linked the stock drop to the disappointing announcement, explaining, "Gartner stock declined ~22% today on a CV miss and lack of commitment to +HSD 2026 CV growth

previously cited by management." Notably, UBS Research wrote: "the CV print is likely worse than most investor expectations, even as the most bearish investors might have had lower estimates."

227. Like the article from MarketWatch, analysts finally understood that CV decreased due to the availability of cheaper AI alternatives. For example, on February 4, 2026, Wells Fargo sharply observed that, "the miss reflects AI-driven pressure, with clients downsizing contracts in favor of LLM tools." Similarly, Morgan Stanley wrote in a February 3, 2026 report that "AI . . . could be making it harder [for Gartner] to grow incremental seats." Similarly, in a February 4, 2026 analyst report, Goldman Sachs wrote: "We believe that there is also potential that competitive displacements by AI . . . are contributing to the growth deceleration."

228. RBC Capital Market Research similarly reported: "[W]ith lack of visibility on the CV growth inflection and GenAI disintermediation concerns, the stock likely remains range bound near-term." Deutsche Bank Research also concluded that "taking a clue from software and IT services sectors there is often no floor to valuation when the market has decided that AI is a risk to the business model." UBS Research added, "As long as CV continues to be sluggish, the narrative of AI headwind remains unanswered."

229. These revelations exposed the fact that Defendants misled investors about Gartner's CV growth and the demand for the Research segment, and concealed material facts concerning the internal problems experienced by the Research segment due to customer dissatisfaction with the quality, value, and pricing of Gartner's products and the availability of cheaper alternatives from AI. It was materially misleading, and therefore actionable, for Defendants to portray Gartner's business practices in a favorable manner, and to promote the Company's CV growth metrics and

guidance, without revealing business and operational information necessary to negate the misleading impression conveyed.

## VII. ADDITIONAL INDICIA OF SCIENTER

230. As alleged, the Individual Defendants acted with scienter in that they knew or recklessly disregarded that their public statements were materially false or misleading when made. In addition to the facts alleged above, Defendants' scienter is further evidenced by the following facts.

### A. Defendants Closely Tracked and Monitored Relevant Information That Contradicted Their Public Statements

231. Throughout the Class Period, Defendants repeatedly admitted that they tracked and closely monitored the Company's internal metrics, including but not limited to contract cancellations, retention numbers, CV growth, client spending, and demand metrics. Defendants also admitted they knew when customers left or reduced their contracts because of cheaper AI alternatives. As such, the Individual Defendants' knowledge of relevant and contrary information was evident from their public statements.

#### 1. Defendants Tracked Every Contract at the Deal Level

232. Specifically, the Individual Defendants repeatedly admitted that they "track[ed] every single deal at the deal level," and closely tracked and knew the reason behind every deal cancellation, including when a deal was cancelled because of AI. For instance, during the August 5, 2025 earnings call, Defendant Hall explained:

> We track every single deal at the deal level. . . . if we win a deal, we ask the client, we ask the salesperson, why did we win? If we lose a deal, we do the same thing. And again, this is not just for renewals. It's for new business as well.

233. During the same call, an analyst asked specifically how Defendants would respond to the narrative that AI was impacting Gartner's business:

> I'm sure you're aware of the narrative that AI could be having some sort of impact on the demand of your services. I was just wondering how you would respond to that and how you would kind of ring-fence any impact on the negative side from AI?

234. In response to the question about the demand for Gartner's services amid the rising popularity of AI, Defendant Hall admitted that he personally monitored the status of Gartner's contracts, including the negotiations of and the length of time it took to close deals in the current environment, stating:

> So basically, first, our pipeline, as I mentioned, is up at robust double-digit rates for both GTS and GBS. I think that's the best indicator of kind of what demand is like. And what we're seeing with the pipeline is that we track the number of days from when a deal enters the pipeline, the number of days it closed. The time required to close deals now has gone up. And the reason it's gone up is that it takes more time. I mentioned earlier that a lot of deals are being escalated from the functional leader like a CIO or a CHRO up to the CFO or CEO. It takes more time in the selling process because our functional leaders ha[ve] to make a business case. The -- just it takes time organizationally for that to get done. And so what I think we're seeing is there's not reduced demand, but closing deals takes longer because the purchasing processes have been stretched out. And that's pretty pervasive and what we've seen in recessions in the past.

### 2. Defendants Tracked Customers That Left or Reduced Spending Because of AI

235. Likewise, during the November 4, 2025 earnings call, an analyst asked: "As we've had more conversations with customers and prospects, how often does LLM, if any, comes [sic] up in those conversation as an alternative to Gartner?" In response, Defendant Hall reiterated that Defendants tracked the reasons customers left Gartner due to cheaper AI alternatives, stating:

> So when we talk to clients, the main thing that comes up with regard to AI is helping them with their -- getting value out of AI, getting ROI out of AI. And so that's the main thing that comes up. If you look at like on a deal level, how many deals do – does the client say, hey, I'm thinking about using AI instead of using Gartner, it would be extremely small. We track, as I talked about in the past, in our system, we actually ask our salespeople to track it. We have follow-up calls with them. We have a lot of interactions. And basically, in terms of when a client actually says, hey, I'm thinking

> about using Gartner versus literally AI, that comes up a very, very, very small number of transactions.

236. Finally, on February 3, 2026, Defendant Hall emphasized that they "ask each salesperson to document any concerns clients have" and "one of the specific ones we ask them to document is if a client brings up that AI might be a substitute." Defendant Hall went on to explain that Gartner's sales team has a helpdesk that "document[s]" and "tracks competitive threats," including instances where clients were "thinking about using AI instead of Gartner," and that "it is regularly used" by Gartner's salespeople.

237. The Individual Defendants further repeatedly admitted that they tracked every deal individually to monitor both contract cancellations and the reasons for every cancellation. On the August 5, 2025 earnings call, for example, Defendant Hall highlighted that the Company "track[ed] the reason for every loss, growth renewals and potential new business" and had "a well-developed system . . . where we track every single deal and we ask the clients, we asked their salespeople kind of what was the reason we won or what was the reason we lost."

238. Similarly, during the February 3, 2026 earnings call, Defendant Hall admitted that "we ask each salesperson to document any concerns clients have. And one of the specific ones we ask them to document is, if a client brings up that AI might be a substitute."

239. Defendants' admissions that they knew why customers left Gartner—considered in context with the FE allegations that customers left during the Class Period because of cheaper AI tools (*see* Sections IV.C, IV.E, and IV.F, *supra*)—establish that Defendants knew that demand for the Company's services was declining due to the availability of cheaper AI alternatives, which was harming and would continue to harm Gartner's CV growth.

### 3. Defendants Had High Visibility into CV Growth, Renewal, and Revenue

240. In addition, the Individual Defendants acknowledged that they closely monitored CV growth during all relevant times and had "very high visibility into the subscription research revenue."

241. For instance, during the July 30, 2024 earnings call, Defendant Safian stated: "We have very high visibility into the subscription research revenue at this point in the year." Similarly, during the November 14, 2024 J.P. Morgan Ultimate Services Investor Conference, Defendant Safian highlighted Defendants' focus on CV growth, noting: "It's the best forward-looking indicator we have for future revenue growth, future free cash flows growth, future profitability. It happens to be what I would characterize as a killer metric for us, which is why we are so focused on it." And, during the February 4, 2025 earnings call, Defendant Safian stated that "We have good visibility into (2025) revenue with the majority of what we've guided already under contract." And during the August 5, 2025 earnings call, Defendant Safian stated: "At this point in the year, we have very high visibility into the Insights subscription revenue for calendar 2025."

242. This visibility resulted from the nature of the contract renewal process. As analysts reported, Gartner's "renewal process is proactive, with efforts to renew contracts months in advance of expiration." Indeed, consistent with that timeline, Defendant Safian explained during the May 2025 earnings call they had received "$30 million worth of termination notices related to contracts that are set to expire later in the year" and were "notified ahead that those things will not be renewing."

243. Critically, Defendants knew about the possibility of contract cancellations months before the contract expired. Because renewals were typically initiated six months before the renewal date, contract cancellations or reduced spending during the renewal period were strong

indicators that CV growth would not be sustained and growth decline was inevitable. *See* Sections IV.C, IV.E, and IV.F, *supra*.

### B. Former Employees Confirm Defendants Reviewed Information Contrary to Their Public Statements

244. Numerous FE accounts confirm that the Individual Defendants were aware of and had access to information that contradicted their public statements.

#### 1. Defendants Tracked Contract Renewals Through the Growth and Retention Team and Win Rooms

245. FE accounts show that through their Growth and Retention Team and "win room," the Individual Defendants knew or had access to relevant information concerning contract renewals. *See* Section IV.C.2, *supra*.

246. Throughout the Class Period, Defendants tracked contract renewals and retained contracts through the Growth and Retention Team. As such, the Individual Defendants knew or had access to data relating to contract cancellations and reduced client spending. *See* Section IV.C.2, *supra*. For instance, FE-4 added that the Growth and Retention Team then separately reported a summary to the CEO and "Executive Team" on their findings on data in growth and retention.

247. Similarly, the findings from the win rooms also support an inference that the Individual Defendants knew of or had access to data demonstrating renewal problems, contract cancellations, and reduced client spending. Specifically, in 2024, Defendants increasingly used a "win room" to address renewal problems and reduced spending among clients. During these meetings, senior sales leadership identified and discussed contracts that were at risk of non-renewal or reduced spending. *See* Section IV.C.2, *supra*. In fact, FE-1's estimate was that 85% of the time the client would cancel anyway.

### 2. Defendants Established the Cancel Council to Monitor and Diagnose Contract Cancellations

248. Through the Company's Cancel Council, the Individual Defendants also knew, had access to, or received relevant information that demonstrated widespread contract cancellations and reduced seats and spending due to the availability of cheaper AI alternatives. By April 2025, the number of contract cancellations reached a tipping point where Defendants established a Cancel Council to scrutinize each contract cancellation and understand the reasons behind each cancellation. *See* Section IV.F, *supra*. Specifically, senior executives and management, including the Individual Defendants, attended the Cancel Council meetings where AI tools were frequently cited by clients as their reasons for reduced spending or cancellations. *See id.*

### 3. Defendants Monitored and Tracked Demand and Retention Problems Through Internal Systems, Reports, and Meetings

249. FE accounts further demonstrate that decreased demand, contract cancellations, reduced spending and seats, and the resulting decrease in CV were aggregated in centralized platforms, such as Salesforce, Stack Rankings, and Power BI, and were regularly discussed or presented in weekly, quarterly, monthly meetings, including operations and sales meetings. *See* Sections IV.C.2 and IV.E, *supra*. Critically, Gartner's senior executives, including the Individual Defendants, had access to it and reviewed these platforms, and attended many of these meetings. *Id.*

250. FE-13 explained that Gartner maintained extensive retention analytics that were reported up the chain of command at the quarterly meetings hosted by Hensel and attended by the Operating Committee. Specifically, Gartner maintained monthly dashboards, including one referred to as the Operating Committee Dashboard, which tracked retention performance at multiple levels, including products, geographies, teams, and leadership structures. According to FE-13, this dashboard—as well as PowerPoint slides which were direct outputs of the dashboard—

were regularly available to senior leadership and the Operating Committee, including Defendants Hall and Safian. FE-13 described both Defendants Hall and Safian as highly detail-oriented executives who had direct access to these materials. Another of many sources of retention analytics was the "Product Finance dashboard," which was created by the finance team. According to FE-13, the operations functions regularly used this dashboard for retention and growth analytics. FE-13 knew that retention became a "huge challenge" throughout much of Gartner's business during the Class Period from his review of these Operating Committee dashboards. During quarterly meetings that he attended during the Class Period, both Hall and Safian acknowledged these retention challenges and the difficult business environment.

251. FE-13 also explained that Gartner maintained a separate forecasting process. Sales forecasts were rolled up through finance and, in his understanding, presented to both Defendants Safian and Hall. In addition to tracking performance metrics and forecasting, Gartner monitored and tracked client feedback and retention through the Global Retention Programs team (also known within the Company as the "Growth and Retention" team), which identified retention risks and potential threats to client renewals. A particularly important component of the Global Retention Program's work was its "Voice of the Customer" efforts, a dedicated function that focused on the systematic collection and analysis of customer feedback.

252. According to FE-2, concerns about declining research quality, pricing rigidity, AI competition and plummeting customer renewal rates were consistently raised from the moment he joined Gartner and throughout his tenure. Those concerns would flow upward through sales channels to his AVP and other leaders, including Beaulieu, McDaniel, and Practice Vice President

Matt Goldman.[9] These issues were discussed in weekly sales meetings and broader monthly regional meetings attended by these leaders.

253. Similarly, according to FE-7, he discussed feedback from clients on switching to AI in "multiple meetings" on Zoom with his RVP Alicia Larkin and SVP on a monthly basis. During these meetings, Larkin and the SVP also discussed with the sales representatives how to differentiate Gartner from AI to clients. He recalled that in 2025, the competition from AI was talked about on quarterly townhalls by "leadership," with CEO Eugene Hall present.

254. Additionally, Defendants tracked research outputs, which were closely tied to a client's CV and spending trend. For example, FE-10 was clear that senior leadership, including Gomolski, monitored research metrics closely. Those metrics included daily page views ("DPVs"), quality ratings given to a given piece of research as assigned by the readers, and how long readers were lingering on a particular page. FE-10 said leaders regularly discussed how research output tied to contract value, whether clients renewed, whether contracts expanded, and whether specific analyst interactions drove additional sales.

255. FE-10 also stated that leadership, including Gomolski and Sribar, was aware of slowdowns and changes in purchasing behavior because internal presentations showed what was up or down quarter-over-quarter and year-over-year across product categories. FE-10 said they would display four-quarter trends and identify where clients were buying more licenses and where they were not purchasing certain services.

### C. Gartner's Research Segment Was Responsible for Nearly All of Gartner's Total Revenue

256. Further bolstering Defendants' scienter is the fact that the Research segment was the most important division at Gartner.

[9] Tyler McDaniel was Regional Vice President, High Tech Sales.

257. Indeed, Gartner generates the majority of its total revenue from the Research segment and therefore is highly dependent on the success of the Research segment. *See* Section IV.A, *supra*. During the February 4, 2025 earnings call, Defendant Hall made clear that "Research continues to be our largest and most profitable segment." According to the Company's 10-Ks, for 2024 and 2025, the Research segment was responsible for approximately 77% and 78% of Gartner's total revenue, respectively.

258. Similarly, Gartner repeatedly emphasized how dependent it was on the Research segment. In its 2024 10-K, Gartner explained that "[a] large portion of our success depends on our ability to generate renewals of our subscription-based research products and services and new sales of such products and services, both to new clients and existing clients."

259. Indeed, the Individual Defendants frequently emphasized the importance of the Research segment to investors. *See* Section IV.A.2, *supra*.

260. Moreover, the Company's CV growth within the Research segment was the most significant metric Defendants and investors monitored, as it was seen as a proxy for the Company's financial growth. *See* Section IV.A.3, *supra*. For instance, on April 10, 2024, UBS Research noted: "Contract Value (CV) growth is an important metric for Gartner as CV directly drives 75%+ of consolidated revenue (and 90%+ of Research segment revenue)." Gartner's 2024 10-K further explained that "[c]omparing contract value year-over-year not only measures the short-term growth of our business, but also signals the long-term health of our Research subscription business since it measures revenue that is highly likely to recur over a multi-year period."

261. In the Company's 2024 Annual Report, Defendants similarly emphasized that "CV is our single most important performance metric" and that "CV growth, which translates to Research revenue growth, is the most important driver of the Company's profit growth."

### D. The Individual Defendants' Suspicious Stock Sales Support and Inference of Scienter

262. The Individual Defendants' insider sales of Gartner stock further support an inference of scienter. During the Class Period, Defendants Hall and Safian knew that the Research segment was experiencing weak demand, contract cancellations, and retention problems that would cause declining CV growth in 2025. In possession of this knowledge, both Defendants reaped substantial financial benefits by selling Gartner stock in 2024 while its price was artificially inflated by their false and misleading statements and before CV growth decelerated in 2025. Moreover, their sales were unusual in both timing and volume: they departed sharply from Defendants Hall's and Safian's own trading history, and they clustered around the dates of the statements that inflated the stock.

**Sales of Gartner Common Stock by the Individual Defendants During the Class Period**




263. In just the first four months of the Class Period, Defendant Hall sold 108,573 shares for $56,021,818 in proceeds, and Defendant Safian sold 17,951 shares for $9,190,410 in proceeds. Neither individual had ever sold such a large dollar amount of Gartner stock in any comparable

four-month period before the Class Period began. Defendants Hall and Safian followed nearly identical patterns, often selling within a day of reassuring investors about the strength and growth of Gartner's Research business. None of these sales were made pursuant to a Rule 10b5-1 trading plan.

264. On July 30, 2024, Gartner held its second-quarter earnings call, during which Defendants reassured investors that the first quarter's 6.9% CV growth rate "***marks the bottom***," explaining that "[w]e have very high visibility into the subscription research revenue at this point in the year." *See* Sections V.A and VII.A.3, *supra*. Following that call, Gartner's stock price rose nearly 6% from the prior day's close of $470.84, closing at $498.77.

265. The next day, July 31, 2024—the first day Defendants were permitted to trade under Gartner's Insider Trading Policy following that quarter's earnings announcement[10]—Defendant Hall sold 39,566 shares at an average price of $502.30 per share, for $19,874,163 in proceeds. That same day, Defendant Safian sold 5,306 shares at an average price of $501.19 per share, for $2,659,314 in proceeds.

266. Over the following two months, as Gartner's stock remained artificially inflated by Defendants' false and misleading statements, Defendants Hall and Safian continued to sell. On August 15, 2024, Defendant Safian sold 6,310 shares at $483.57 per share, for $3,051,326.70 in proceeds. On September 12, 2024, Defendant Hall sold another 34,060 shares at an average price of $505.40 per share, for $17,213,808 in proceeds.

267. On November 5, 2024, Gartner held its third-quarter earnings call, during which Defendants again touted the Company's CV growth and reassured investors that they had seen no change in client spending. *See* Section V.B, *supra*. Gartner's stock rose nearly 2% that day, closing

---

[10] *See* Gartner, Inc., Insider Trading Policy § 5(a), Ex. 19 to 2024 10-K.

at $513.58. The next day, November 6, 2024—the first day Defendants were permitted to trade following that quarter's earnings announcement—Gartner's stock climbed another 5% to $536.90, then an all-time high. Defendant Hall sold 16,651 shares that day at $536.90 per share, for $8,939,922 in proceeds.

268. Over the next two days, Gartner's stock climbed further, closing at $547.40 on Friday, November 8, 2024—another all-time high. That day, Defendant Hall sold 18,296 shares at an average price of $546.24 per share, for $9,993,925.88 in proceeds, and Defendant Safian sold 2,819 shares at $547.40 per share, for $1,543,120.60 in proceeds. The next trading day, on November 11, 2024, Gartner's stock reached a further all-time intraday high of $559.00 before closing at $547.16. That day, Defendant Safian sold 3,516 shares at $550.81 per share, for $1,936,647.96 in proceeds.

269. Defendants Hall's and Safian's trading activity during this roughly one-hundred-day span was unusual. Not only did they sell immediately following their false and misleading statements, but their trading activity during this period also departed from their historical trading activity. During their twenty-two and ten-year tenures as CEO and CFO, respectively, Defendants Hall and Safian had never before sold in July—the point in the year which Defendants assured investors they have "very high visibility into the subscription research revenue." In all, over that roughly one-hundred-day span, from July 31 to November 11, 2024, Defendant Hall received $56,021,818 in proceeds from his sales of Gartner stock and Defendant Safian received $9,190,410 in proceeds, more than either individual had ever sold in any comparable four-month period before the Class Period began.

270. Finally, on May 6, 2025, Gartner held its first-quarter 2025 earnings call, during which Defendant Safian again reassured investors that client retention was "holding up really

well." Gartner's stock closed that day at a thirty-day high of $432.92. Less than a week later, on May 12, 2025, the stock climbed to $447.41, and Defendant Safian sold 3,680 shares that day for $1,644,776 in proceeds. The next day, May 13, 2025, Defendant Safian sold another 3,415 shares for $1,537,331 in proceeds. At the time of those sales, Defendant Safian knew about Gartner's declining CV growth during the second quarter of 2025. When those results were announced to the public in August 2025, Gartner's stock price dropped by 27.55% in a single day to $243.93 per share.

271. In total, Defendants Hall and Safian sold Gartner stock during the Class Period at an average price more than double the $243.93 closing price that followed the first corrective disclosure, and more than triple the $160.16 closing price that followed the final corrective disclosure. These sales allowed Defendants Hall and Safian to avoid considerable losses relative to the counterfactual world in which they had waited until the truth was revealed to sell their stock.

## VIII. INAPPLICABILITY OF STATUTORY SAFE HARBOR

272. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein. The statements alleged to be false and misleading all relate to then-existing facts and conditions or are mixed statements of historical or present information and future information, that are not entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

273. To the extent certain of the statements alleged to be false or misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made and no meaningful cautionary language identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

274. To the extent Defendants included cautionary language concerning, but not limited to, competition from AI, impact from macroeconomic conditions on CV and CV growth, and Gartner's ability to accurately forecast its CV and CV growth, that language was not meaningful not only because the language was highly generic but also because any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, Gartner was experiencing widespread cancellations, reductions in seats and spending, and decreased demand because of customer dissatisfaction with the quality, value, and pricing of Gartner's product and the availability of cheaper alternatives from AI.

275. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded, Defendants are liable for the statements because at the time each was made, they had actual knowledge it was materially false or misleading, or the statement was authorized or approved by an executive officer of Gartner who knew the statement was false when made.

## IX. CONTROL PERSON ALLEGATIONS

276. The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in its day-to-day operations at the highest levels. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements therein and of their materially false and misleading nature.

277. The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to Gartner during the Class Period. The Individual Defendants were provided with

copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the alleged misrepresentations.

278. The Individual Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about Gartner's business through access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly held meetings, as well as other management and Board of Directors meetings, and reports and other information provided to them in connection therewith.

279. As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Gartner's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of Gartner common stock would be based upon truthful and accurate information. The Individual Defendants' wrongdoing violated these specific requirements and obligations.

280. In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Gartner, were acting on behalf of the Company in the regular course of business. Therefore, each statement made by the Individual Defendants during the Class Period is attributable to the Company.

## X. CLASS ACTION ALLEGATIONS

281. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Gartner during the period from July 30, 2024 through February 2, 2026, inclusive. Excluded from the Class are: (i) Defendants; (ii) Individual Defendants' immediate family members; (iii) any officer, director, or control person of Gartner during the Class Period, and their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) Gartner's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

282. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Gartner's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Gartner shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Gartner or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

283. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

284. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

285. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Gartner;

(c) whether, and to what extent, the market price of Gartner common stock was artificially inflated during the Class Period because of the alleged material misstatements;

(d) whether Defendants acted with the requisite level of scienter;

(e) whether the Individual Defendants were controlling persons of Gartner; and

(f) whether the members of the Class have sustained damages because of the conduct complained of herein, and if so, the proper measure of damages.

286. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. PRESUMPTION OF RELIANCE

287. To the extent that Plaintiffs allege affirmative misstatements, Plaintiffs are entitled to rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations, or failed to disclose material facts required to render other statements non-misleading, during the Class Period;

(b) the misrepresentations were material;

(c) Gartner common stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Gartner common stock;

(e) Plaintiffs and other members of the Class purchased Gartner common stock between the time of the misrepresentations and disclosure of the true facts, without knowledge of the misrepresented or omitted facts;

(f) Gartner common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(g) according to the Company's SEC Form 10-K filed on February 12, 2026, the Company had approximately 70,450,294 shares then outstanding, demonstrating a very active and broad market for Gartner common stock;

(h) Gartner filed periodic public reports with the SEC;

(i) Gartner regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services, the internet and other wide-ranging public disclosures;

(j) Gartner was followed by securities analysts employed by major brokerage firms, including Goldman Sachs, Wells Fargo, Morgan Stanley, Jefferies Research, and UBS Research, which wrote reports distributed to the sales force and customers of their respective brokerage firms, were publicly available, and entered the public marketplace;

(k) unexpected material news about Gartner was rapidly reflected in and incorporated into the Company's stock price during the Class Period; and

(l) there were market makers for Gartner common stock during the Class Period.

288. As a result of the foregoing, the market for Gartner common stock promptly digested current information about Gartner from publicly available sources and reflected such information in its share price. Under these circumstances, all Class members suffered similar injuries through their purchases of Gartner common stock at artificially inflated prices and the presumption of reliance applies.

289. The material misrepresentations alleged herein would induce a reasonable investor to misjudge the value of Gartner common stock.

290. To the extent that Defendants improperly failed to disclose material facts about Gartner's business, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XII. CAUSES OF ACTION

### COUNT I

### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5 PROMULGATED THEREUNDER (Against Defendant Gartner and the Individual Defendants)

291. Plaintiffs repeat and re-allege every allegation set forth above as if fully set forth herein.

292. This Count is asserted on behalf of all members of the Class against Gartner, Hall, and Safian for violations of § 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

293. As alleged, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading, in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially manipulate the price of Gartner common stock; and (iii) cause Plaintiffs and members of the Class to purchase Gartner common stock at artificially inflated prices.

294. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

295. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described knowingly and intentionally, or in such

a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Gartner common stock during the Class Period.

296. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Gartner common stock, Plaintiffs and other members of the Class purchased Gartner common stock at artificially inflated prices during the Class Period. But for the fraud, Plaintiffs and members of the Class would not have purchased Gartner common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the stock price declined precipitously, and Plaintiffs and members of the Class were damaged and harmed as a direct and proximate result of their purchases at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

297. By virtue of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

## FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
## (Against Defendants Hall and Safian)

298. Plaintiffs repeat and re-allege every allegation set forth above as if fully set forth herein.

299. This Count is asserted on behalf of all members of the Class against the Individual Defendants for violation of § 20(a) of the Exchange Act.

300. The Individual Defendants had control over Gartner and made the materially false and misleading statements and omissions on behalf of Gartner within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their executive positions and culpable participation in the fraud, as alleged above, the Individual Defendants had the power to influence

and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Plaintiffs contend were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

301. The Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. Additionally, to the extent necessary, the Individual Defendants actually exercised control over Gartner, including by, among other things, directing the Company to issue materially false and misleading statements to the investing public in group-published and other materials.

302. By reason of such wrongful conduct, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with purchasing the Company's securities during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a) Declaring the action to be a proper class action pursuant to Fed. R. Civ. P. Rule 23 and certifying Plaintiffs as the Class Representatives and Plaintiffs' counsel as Class Counsel;

(b) Awarding compensatory damages in favor of Plaintiffs and the Class against all Defendants, jointly and severally, for all damages sustained as a

result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and expert fees; and

(d) Awarding such equitable, injunctive, and other relief as the Court may deem just and proper.

## XIV. DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: July 27, 2026

Respectfully submitted,

*/s/ Michael P. Canty*
**LABATON KELLER SUCHAROW LLP**
Michael P. Canty (phv20068)
James T. Christie (phv08304)
Nicholas D. Manningham (phv209512)
Kaicheng Yu (phv208046)
140 Broadway
New York, NY 10005
Tel.: (212) 907-0700
Fax: (212) 818-0477
mcanty@labaton.com
jchristie@labaton.com
nmanningham@labaton.com
nyu@labaton.com

**COHEN MILSTEIN SELLERS & TOLL LLP**
Laura H. Posner (phv209474)
88 Pine Street, 14th Floor
New York, NY 10005
Tel.: (212) 220-2925
Fax: (212) 838-7745
lposner@cohenmilstein.com

- and –

**COHEN MILSTEIN SELLERS & TOLL LLP**
Steven J. Toll (phv08964)
Jan E. Messerschmidt (phv10997)
E. Christina Schiciano (phv209475)
1100 New York Avenue, N.W., Suite 800
Washington, D.C. 20005
Tel.: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
jmesserschmidt@cohenmilstein.com
cschiciano@cohenmilstein.com

*Co-Lead Counsel for Plaintiffs and the Class*

**HURWITZ SAGARIN & SLOSSBERG LLC**
David A. Slossberg (ct13116)
Erica O. Nolan (ct31097)
135 Broad Street
Milford, CT 06460
Tel: (203) 877-8000
Fax: (203) 878-9800
dslossberg@hss.law
enolan@hss.law

*Liaison Counsel for Plaintiffs and the Class*

**CERTIFICATE OF SERVICE**

This is to certify that on July 27, 2026, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to all parties that are unable to accept electronic filing. Parties may access this filing through the Court's electronic system.

*/s/ Erica O. Nolan*
Erica O. Nolan